BULL MOTOR COMPANY *v.* Jason MURPHY

CA 07–183 270 S.W.3d 350

Court of Appeals of Arkansas
Opinion delivered December 19, 2007

[Rehearing denied January 23, 2008.*]

---

* ROBBINS, GRIFFEN and MARSHALL, JJ., would grant rehearing.

*Easely & Houseal*, by: *B. Michael Easley* and *John I. Houseal*, for appellant.

*Jesse B. Daggett, P.A.*, by: *Jesse B. Daggett*, for appellee.

JOHN MAUZY PITTMAN, Chief Judge. An unknown thief took a new truck from the lot of appellant Bull Motor Company (BMC) and drove it for a short period of time before the

truck was recovered and returned to BMC. BMC subsequently sold the truck as "new" to appellee Jason Murphy without disclosing this history. Upon discovering the true history, Murphy filed suit. A jury awarded Murphy $7,000 in damages. In this appeal from that verdict, BMC raises four points for reversal. We affirm.

## Background

On December 8, 2004, a thief stole a 2005 truck from BMC. The truck was recovered by the police ninety minutes later and had been driven forty miles. The truck was returned to BMC's lot. On January 4, 2005, Murphy purchased the truck as a "new" truck for $33,495. The salesman, Bo Henderson, was unaware that the truck had been stolen at the time of the sale and did not disclose the information to Murphy.

On March 10, 2005, Murphy filed suit, alleging that BMC breached the sales contract by not disclosing the prior theft of the truck. The complaint also asserted that the vehicle was worth $8,495 less because it had been stolen and driven by the thief. BMC denied the material allegations of the complaint and asserted that Murphy had not suffered any damages. BMC later moved for summary judgment, contending that Murphy suffered no damages in that he received a "new" vehicle because Ark. Code Ann. § 23-112-103(22) (Repl. 2004) defines a "new" vehicle as one whose title has not been transferred to an ultimate purchaser. The circuit court denied the motion, and the case proceeded to trial.

## The Evidence

At trial, Murphy testified that he wanted a "new" vehicle — one that had not been stolen or wrecked. This was important to him, he said, because he was looking for dependable transportation to work and one would not know how the thief drove the vehicle. He opined that the vehicle he purchased was "used," not "new," because it had been stolen and driven by the thief. Murphy stated that, when he learned that the truck had been stolen, he called BMC and asked for another "new" vehicle but that they refused the request. At that time, he had driven the truck approximately 1,000 miles. Over BMC's objection, he testified that the rear end had to be replaced at 18,000 miles. He acknowledged that he did not know whether the thief's actions had any effect on the rear end. Murphy stated that he would not have bought the truck for the same price if he had known it to have been stolen. He said that the price would have had to be reduced some $8,000 to $10,000

before he bought the stolen truck. He also said that it did not matter how long the thief had the truck or how far it was driven because it was still a "used" truck. On cross-examination, he acknowledged that there was nothing wrong with the truck's interior or exterior or how it drove when he purchased it. He also said that the knowledge that the truck had been stolen had weighed on his mind.

Tony Bull, owner of BMC, testified that, after the truck was recovered, it was thoroughly inspected and tested with no damage found. He also said that he was sure that Bo Henderson did not know that the truck had been stolen and explained that it was simply a mistake that it was not disclosed to Murphy. He said that there was no effort to deceive Murphy and that he tried to rectify the situation by offering to extend the truck's warranty. He opined that, if the thief did any damage to the truck, it would have manifested itself within the first 2,000 miles. He did not know how the thief drove the vehicle but further opined that the truck's value was not affected by being driven for forty miles by the thief. Bull stated that the truck's being driven by the thief does not characterize it as a "used" vehicle because a "new" vehicle is one that has never been registered or titled. On cross-examination, Bull was unable to state how much the vehicle's value would be reduced if Murphy had taken the vehicle and driven it for one day before returning it.

Bo Henderson testified that he was unaware of the truck's having been stolen at the time he sold it to Murphy and asserted that he would have disclosed that fact to Murphy had he known it. According to Henderson, there was nothing in the truck's record to indicate that it had been stolen because it had not been damaged. He also said that the average customer would select the truck that had not been stolen and that it would probably have been necessary to reduce the price in order to sell the stolen truck. According to Henderson, an appropriate reduction would be $1,000 to $1,500.

Dean Sides, a car dealer in Newport, testified that a "new" vehicle is one that has not been sold or titled. He opined that the theft would not reduce the value of the truck. He described the thief's action as "not much more than a test drive." He also allowed that a dealer may have to discount the price because of the vehicle's tarnished reputation. He said that it would be something difficult to value.

James Smith, BMC's service manager, testified that he tested Murphy's truck and did not find any problems. He asserted that

any damage to the rear end of the truck would have immediately been discovered. He acknowledged that the computer did not check the rear differential and that there could be damage that went undiscovered.

Over BMC's objection, the circuit court gave AMI 2412 concerning ambiguity in the meaning of the term "new vehicle" and that it was the jury's job to determine what the parties meant by that term. The jury was also instructed on the statutory definitions of the term "new vehicle" and "used vehicle." The jury returned a verdict signed by ten jurors finding in favor of Murphy and awarding him $7,000 in damages. BMC filed a motion for new trial or judgment notwithstanding the verdict, asserting that there was no substantial evidence to support the award of damages or that BMC did not sell Murphy a "new motor vehicle." The motion for new trial was based on asserted error in allowing Murphy to testify that the truck needed axle repairs at 18,000 miles; that the testimony that the truck decreased in value by $8,495 was speculative; and that the damages award of $7,000 was against the preponderance of the evidence. The circuit court denied the motion. Judgment was entered on the jury verdict, and the circuit court awarded Murphy attorney's fees of $4,164. This appeal followed.

## Arguments on Appeal

In its first point, BMC argues that the circuit court erred in denying its motion for summary judgment, its motion for a directed verdict, and its motion for judgment notwithstanding the verdict because the truck was, as a matter of law, "new."

We cannot address the summary-judgment issue. The denial of a motion for summary judgment is not an appealable order; even after there has been a trial on the merits, the denial order is not subject to review on appeal. *Bharodia v. Pledger*, 340 Ark. 547, 11 S.W.3d 540 (2000); *Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991).

BMC's argument is that the meaning of the phrase "new vehicle" is determined, as a matter of law, by the statutory definition contained in section 23-112-103(22). We disagree. It is axiomatic that the laws in force when and where a contract is made and to be performed enter into and form part of the contract. This rule is limited, however, to laws that are *applicable* to the contract. *Union Indem. Co. v. Forgey & Hanson*, 174 Ark. 1110, 298 S.W. 1032 (1927); *see Wing v. Forest Lawn Cemetery Ass'n*, 15 Cal. 2d 472,

101 P.2d 1099 (1940); WILLISTON ON CONTRACTS § 3019 (2007). Arkansas Code Annotated section 23-112-103(22) is not applicable to an agreement of sale between an automobile dealer and a consumer. That statute is part of the Arkansas Motor Vehicle Commission Act, which was expressly intended to create an administrative agency to license persons and entities involved in the manufacture, distribution, and sale of motor vehicles so as to "[p]revent frauds, unfair practices, discrimination, impositions, and other abuses upon the citizens of Arkansas." Ark. Code Ann. § 23-112-102(b)(1).[1]

The purposes for the differing requirements are many, but chief among them is to prevent used auto dealerships from operating as fly-by-night businesses that engage in the sort of fraud commonly associated with such concerns. *See* Ark. Code Ann. § 23-112-601. It is instructive in this context to note that the definition of "used motor vehicle" in § 23-112-602(8) includes not only those vehicles that previously have been sold and titled, but also any vehicle that has been "so used as to have become what is commonly known as a secondhand or previously owned motor vehicle." Thus, the Act itself contemplates a vehicle that has never been titled but is nevertheless "secondhand" by virtue of the use or abuse to which it has been subjected — like the vehicle in this case.

The purpose of the rule incorporating applicable law into every contract is to comply with the federal constitutional prohibition against the enactment of laws impairing contractual obligations, not to impose by law a particular meaning to a term used in the agreement. *See Ellison v. Tubb*, 295 Ark. 312, 749 S.W.2d 650 (1988); *Robards v. Brown*, 40 Ark. 423 (1883).

Section 201 of the RESTATEMENT (SECOND) OF CONTRACTS makes this plain. It states:

> (1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

---

[1] The dissenting judge's disagreement is founded on his mistaken notion that the Arkansas Motor Vehicle Commission Act is "applicable law" in the context of this case. His position is misguided. The reason that a "new vehicle" is defined in the Act is not to regulate sales by motor vehicle dealers to third parties, but instead to distinguish between "new motor vehicle dealers" and "used motor vehicle dealers." Both types of dealers must be licensed, and the applicable licenses have requirements that differ. *Compare* Ark. Code Ann. §§ 23-112-302 and 23-112-607.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

 (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

 (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

The Comment to this section deals with the precise situation that is before us in this case:

 a. The meaning of words. Words are used as conventional symbols of mental states, with standardized meanings based on habitual or customary practice. Unless a different intention is shown, language is interpreted in accordance with its generally prevailing meaning. See § 202(3). Usages of varying degrees of generality are recorded in dictionaries, but there are substantial differences between English and American usages and between usages in different parts of the United States. Differences of usage also exist in various localities and in different social, economic, religious and ethnic groups. All these usages change over time, and persons engaged in transactions with each other often develop temporary usages peculiar to themselves. Moreover, most words are commonly used in more than one sense.

 b. The problem of context. Uncertainties in the meaning of words are ordinarily greatly reduced by the context in which they are used. The same is true of other conventional symbols, and the meaning of conduct not used as a conventional symbol is even more dependent on its setting. But the context of words and other conduct is seldom exactly the same for two different people, since connotations depend on the entire past experience and the attitudes and expectations of the person whose understanding is in question. In general, the context relevant to interpretation of a bargain is the

context common to both parties. More precisely, the question of meaning in cases of misunderstanding depends on an inquiry into what each party knew or had reason to know, as stated in Subsections (2) and (3). See § 20 and Illustrations. Ordinarily a party has reason to know of meanings in general usage.

c. Mutual understanding. Subsection (1) makes it clear that the primary search is for a common meaning of the parties, not a meaning imposed on them by the law. To the extent that a mutual understanding is displaced by government regulation, the resulting obligation does not rest on "interpretation" in the sense used here. The objective of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding: "the courts do not make a contract for the parties." Ordinarily, therefore, the mutual understanding of the parties prevails even where the contractual term has been defined differently by statute or administrative regulation. But parties who used a standardized term in an unusual sense obviously run the risk that their agreement will be misinterpreted in litigation.

d. Misunderstanding. Subsection (2) follows the terminology of § 20, referring to the understanding of each party as the meaning "attached" by him to a term of a promise or agreement. Where the rules stated in Subsections (1) and (2) do not apply, neither party is bound by the understanding of the other. The result may be an entire failure of agreement or a failure to agree as to a term. There may be a binding contract despite failure to agree as to a term, if the term is not essential or if it can be supplied. See § 204. In some cases a party can waive the misunderstanding and enforce the contract in accordance with the understanding of the other party.

■ The generally prevailing meaning of a "new" vehicle does not include a vehicle that has been stolen. *See Greiner Motor Co. v. Sumpter*, 244 Ark. 736, 427 S.W.2d 8 (1968). Here, BMC had reason to know this, and Murphy had no reason to know that the definition of a new vehicle, contained in the Arkansas Motor Vehicle Commission Act for purposes of distinguishing between new and used car dealers, provided otherwise.

BMC's second point is that the circuit court erred in denying its motion for summary judgment, its motion for a directed verdict, and its motion for judgment notwithstanding the verdict because Murphy failed to prove the difference in the fair market value of the truck as represented and as received.

 Again, we cannot consider the summary-judgment issue. BMC's argument is that the truck was not damaged and, therefore, Murphy's testimony as to the value of the truck being decreased was pure speculation. Here, contrary to BMC's argument, there was proof of damage to the vehicle other than in Murphy's mind. BMC witness Dean Sides testified that a vehicle that had been stolen and returned to the dealer undamaged would nevertheless have a tarnished reputation and that a reduction in price may be necessary to sell the vehicle. Bo Henderson testified that a reduction in price of $1,000 to $1,500 would be appropriate. Murphy testified that, in his opinion, the value of the truck had been diminished by between $8,000 and $10,000 by being driven by the thief. It is well-settled Arkansas law that the owner of personal property is qualified to give an opinion as to its value. *Walt Bennett Ford, Inc. v. Brown*, 283 Ark. 1, 670 S.W.2d 441 (1984). No special training or occupation is necessary to qualify a witness to estimate values. *Naples Rest., Inc. v. Coberly Ford*, 259 Cal. App. 2d 881, 66 Cal. Rptr. 835 (1968).[2] The sales contract established the fair market price of the truck and Murphy's testimony established the difference in the actual value at the time of purchase. Therefore, the jury could properly award Murphy $7,000 in damages.

For its third point on appeal, BMC contends that the circuit court erred in allowing Murphy to testify that the rear end on the truck had to be replaced at 18,000 miles. Murphy acknowledged that he did not know if the problem was caused by the thief. BMC objected to Murphy's testimony on the basis that it was irrelevant and that there was no proof that the problem was caused by the thief's actions. The circuit court overruled the objection, finding the testimony relevant. The standard of review on admission of evidence is abuse of discretion. *FMC Corp., Inc. v. Helton*, 360 Ark. 465, 202 S.W.3d 490 (2005).

 The circuit court only ruled that the evidence was relevant; it did not address the other grounds of BMC's objection. We believe that the testimony was relevant because it showed the doubts Murphy had about the vehicle and why, in his opinion, the value was reduced from the contract price. Second, BMC also

---

[2] This case also held that the statutory definition of a "new" vehicle was not controlling where the vehicle had been stolen from the dealer's lot prior to the sale.

addressed the subject in its examination of its own witnesses, Tony Bull, Dean Sides, and James Smith. Here, BMC's witnesses discussed the likelihood of a vehicle's rear end needing replacement at 18,000 miles. In such circumstances, there is no prejudice. *See Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001); *Aaron v. State*, 300 Ark. 13, 775 S.W.2d 894 (1989).

■ BMC's final point is that the circuit court erred in instructing the jury based on AMI 2412, concerning an ambiguity in a contract term. Our courts have consistently held that a party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *See, e.g., Byrne, Inc. v. Ivy*, 367 Ark. 451, 241 S.W.3d 229 (2006).

Here, the jury was instructed as to AMI 2412 as follows:

> The parties dispute the meaning of the term "new vehicle" in their contract. It is your duty to interpret the contract to give effect to what the parties intended when they made their agreement. In determining the meaning of the language, you must take into consideration the language of the contract, the circumstances surrounding the making of the contract, the subject of the contract, the purpose of the contract, the situation and relation of the parties at the time the contract was made, the parties' subsequent course of performance. You should give the words of the contract their plain, ordinary, and usual meaning, unless it is clear that certain words were intended to be used in a technical sense.

The jury was also instructed on the statutory definitions of "new" and "used" vehicles. Because we have held that the definition of the term "new vehicle" is not determined by reference to the statute but, rather, by the parties' intentions, the circuit court properly gave the disputed instruction because the jury was told to consider the circumstances in making the contract, that is, the fact that the truck was first driven by a thief for some forty miles prior to being sold to Murphy, to determine whether Murphy received a "new" truck.

Affirmed.

GLADWIN, BIRD, VAUGHT, and BAKER, JJ., agree.

ROBBINS and HEFFLEY, JJ., agree in part; dissent in part.

GRIFFEN and MARSHALL, JJ., dissent.

J OHN B. ROBBINS, Judge, dissenting. Mr. Murphy knew when he bought his truck that there were 120 miles on its odometer and that the sticker price was $37,100, yet he bought it, paying $33,495. However, neither he nor the salesman knew that 40 of the 120 miles had been driven by a thief. Assuming that the trial court was correct, as affirmed by five judges of this nine-judge panel, that Mr. Murphy was indeed entitled to receive some damages because of these 40 unauthorized miles, an award of $7,000 defies reason and is clearly against the preponderance of the evidence. The trial court should have so found and granted a new trial, and we compound the injustice by failing to correct the error. See Ark. R. Civ. P. 59(a)(6).

I dissent.

HEFFLEY, J., joins.

D .P. MARSHALL JR., Judge, dissenting. This case should be retried, and I therefore respectfully dissent from the court's decision.

1. *New or Used?* The court is mistaken on this point, while Bull Motor is partly correct and partly mistaken. The parties' contract reflects that Murphy bought a "N" — for new — pick-up truck. He did. Arkansas has a comprehensive statutory scheme regulating motor vehicle dealers for the benefit of consumers and our state's economy. Ark. Code Ann. §§ 23-112-102 *et seq.*, and 23-112-601 *et seq.* Part of our code defines new motor vehicles and used motor vehicles. Ark. Code Ann. §§ 23-112-103(22) and (31)(A) and 23-112-602(10)(A). This truck was new — as a matter of law — because no entity had ever transferred the title to an ultimate purchaser. Ark. Code Ann. § 23-112-103(22).

The new/used issue was a question of law for the circuit court to answer against the background of this existing law, not a question of fact for the jury. The court cites the governing precedent but does not follow it. "The laws which are in force at the time when, and the place where, a contract is made and to be performed, enter into and form a part of it. This is only another mode of saying that parties are conclusively presumed to contract with reference to the existing law." *Robards v. Brown*, 40 Ark. 423, 427 (1883). Our Supreme Court has applied this unremarkable holding as recently as *Woodend v. Southland Racing Corp.*, 337 Ark. 380, 384, 989 S.W.2d 505, 507 (1999).

This legal principle has work to do, as the court says, in cases implicating the Contract Clause where the law has changed since the parties struck their bargain. *E.g., Ellison v. Tubb*, 295 Ark. 312, 316(17, 749 S.W.2d 650, 652-53 (1988). But contrary to the court's suggestion, this principle applies in other contexts too. For example, *Cook Grains, Inc. v. Fallis*, 239 Ark. 962, 963-65, 395 S.W.2d 555, 556-57 (1965), was a breach-of-contract action brought by a grain dealer against a farmer. The case turned on whether the farmer was a "merchant" under the U.C.C. The point is that our statutes embody our State's public policy. *State Farm Mut. Auto. Ins. Co. v. Henderson*, 356 Ark. 335, 342-43, 150 S.W.3d 276, 280 (2004). Where, as here, the contract arises in an area regulated by existing State law, the applicable statutes must be applied when deciding what the parties' chosen words mean. *Woodend, supra* (a betting contract); *Cook Grains, Inc., supra* (a commercial contract); *Union Indemnity Co. v. Forgey & Hanson*, 174 Ark. 1110, 1112, 298 S.W. 1032, 1033 (1927) (a bond). None of these cases involve the Contract Clause.

"In other words, a statutory provision relating to the subject-matter of a contract, by operation of law enters into and becomes part of the contract." *Union Indemnity Co.*, 174 Ark. at 1112, 298 S.W. at 1033. We must therefore conclusively presume that the parties contracted with reference to the Arkansas Motor Vehicle Commission Act, and in particular to the definitions in the statute. *Ellison*, 295 Ark. at 316-17, 749 S.W.2d at 652-53. If the terms of this Act are not part of every contract for the sale of motor vehicles in this state, then the purpose of this important regulatory scheme will be defeated. It cannot be the law in Arkansas today that the subjective intentions of buyers and sellers determine whether vehicles are new or used. A dealer and a buyer cannot contract around the statute by agreeing that a titled vehicle is "new" or that a never-titled vehicle is "used."

The *Greiner Motor* case makes this point as a matter of history. 244 Ark. 736, 737, 427 S.W.2d 8, 9 (1968). The court relies on Justice George Rose Smith's 1968 opinion for the proposition that "[t]he generally prevailing meaning of a 'new' vehicle does not include vehicles that have been stolen." In that case, the court held that the new/used issue was for the jury. 244 Ark. at 737, 427 S.W.2d at 9. The supreme court did so, however, against a different background of existing law. The General Assembly did not adopt the motor vehicle statutes now in place until 1975, seven years after *Greiner Motor* was decided. Act 388 of 1975. Forty years

ago, the definition of a vehicle as new or used was left to the seller and the buyer — and then to the jury if a dispute arose. Not any more.

The circuit court erred by not deciding the new/used issue for Bull Motor. Whether a contract is ambiguous is always a question of law for the court. *Western World Ins. Co. v. Branch*, 332 Ark. 427, 430, 965 S.W. 2d 760, 761 (1998). And the meaning of any ambiguous term is likewise always a question of law for the court, unless that meaning must be decided based on disputed extrinsic evidence. *Smith v. Prudential Property and Casualty Ins. Co.*, 340 Ark. 335, 341, 10 S.W.3d 846, 850 (2000).

Here, the parties' description of this truck as new was not ambiguous. The statute fixed the meaning of this term. Even if some ambiguity is assumed, resolving the term's meaning did not turn on disputed extrinsic evidence. All the material facts — the theft, the salesman's lack of knowledge, Murphy's lack of knowledge — were undisputed. The statute's words are also clear. As Murphy candidly acknowledged during the arguments about a directed verdict, "[i]f you want to consider this a new vehicle under the Arkansas code as defined, we will stipulate to anybody that wants to read it, it was a new vehicle under the code." Therefore, the circuit court made a reversible error by leaving the new/used issue alive. As Bull Motor correctly argues, the court erred by instructing the jury to decide this illusory ambiguity.

Bull Motor, however, was not entitled to judgment as a matter of law on Murphy's complaint. Murphy got a new truck. But it was a new truck that had been stolen. Bull Motor's nondisclosure of this material fact was a breach of the parties' contract. *Currier v. Spencer*, 299 Ark. 182, 185-86, 772 S.W.2d 309, 311-12 (1989). The nondisclosure was also a constructive fraud. *Roach v. Concord Boat Corp.*, 317 Ark. 474, 476-77, 880 S.W.2d 305, 306-07 (1994). However the claim was pleaded, here again all the material facts — theft, nondisclosure, justifiable reliance, and purchase — were undisputed. Apart from its statutory defense, Bull Motor essentially conceded liability for the incomplete information that tainted the parties' deal. Murphy knew that he was buying a truck with one hundred and twenty miles on it. What he did not know was that a thief had put forty of those miles on the truck. The real question for the jury was Murphy's damages: how did the thief's forty miles affect the pick-up's fair market value at the time Murphy bought the truck?

2. *The Damages.* $7,000.00 in damages for a forty-mile trip by a thief is clearly against the preponderance of the admissible evidence. Giving the credible evidence its greatest possible weight, the proof supports damages of only $1,000.00 to $1,500.00. The circuit court correctly instructed the jury that Murphy was entitled to damages representing the difference between the vehicle's contract price and the vehicle's market value at the time of the breach. AMI 2519–Civil (Ed. 2007). The breach occurred at the sale, when Bull Motor failed to tell Murphy about the theft. The only credible evidence on this difference in value was Bull Motor's salesman's admission on cross-examination that a price reduction of $1,000.00 to $1,500.00 would have been appropriate. Over Bull Motor's objection, Murphy testified that, in his opinion, the truck's value was reduced between $8,000.00 and $10,000.00 by being driven by the thief. Based solely on that testimony, the jury awarded him $7,000.00. Because Murphy provided no rational basis for his figures, however, the damage award should not stand.

Our cases have consistently held that an owner is qualified to give an opinion about the value of his own personal property. *Walt Bennett Ford, Inc. v. Brown,* 283 Ark. 1, 4, 670 S.W.2d 441, 443 (1984). This rule of law is sensible and settled. But the owner's opinion on value must be based on something more than speculation. It cannot be "plucked from the air without any fair and reasonable basis." *Ark. State Highway Comm'n v. Steen,* 253 Ark. 908, 914, 489 S.W.2d 781, 784 (1973). Our law allows an owner to testify about the value of his property because he has shopped for it, paid for it, repaired it, and lived with it. This is the reason behind this rule of law. But as the maxim states, *cessante ratione legis, cessat ipse lex:* the reason of the law ceasing, the law itself ceases.

Had Murphy been testifying about the truck's value in an accident case arising after he had owned the vehicle for some time, then of course he could give his opinion about the truck's value. This testimony would be based on his experience. *Cf. Minerva Enterprises, Inc. v. Howlett,* 308 Ark. 291, 824 S.W.2d 377 (1992). That, however, is not what happened. The circuit court allowed Murphy to testify about the value of the truck *at the time of sale* as a new truck that had been stolen. But Murphy gave no testimony showing that he had any basis to speak about the truck's actual value at that time. Murphy never had the vehicle appraised after he learned of the theft. He did no comparison shopping to see what a similar new truck that had been stolen would sell for. He did no repairs when he bought the truck — because, he acknowledged,

there was nothing wrong with it then. Murphy had no foundation for his opinion about the actual value of this new but stolen truck.

This would be a different case if Murphy had provided expert testimony to support his calculation of damages. *Cf. Moore Ford Co. v. Smith*, 270 Ark. 340, 604 S.W.2d 943 (1980). It would also be different if Murphy had taken the truck to a repairman, who could have provided a list of damaged parts and an estimate to repair them. *Cf. Zahn v. Sherman*, 323 Ark. 172, 913 S.W.2d 776 (1996); *Walt Bennett Ford, supra*. Nothing like this ever happened. Murphy simply had no fair or reasonable basis for his testimony about how much the price of the truck should have been reduced because of the theft.

The record shows the basis for Murphy's damages testimony, and that basis further undermines his speculative numbers. Murphy claimed that he was harmed by the uncertainties he felt knowing that his truck had been stolen. Murphy testified:

- "If [Bull Motor had] had the truck and it'd been $5,000.00 off, I wouldn't of bought it. . . . it wouldn't be worth it, wondering what — what's ever going to tear up on the truck, how it'd been drove."

- "When I hear a noise, that's what I wonder, what did he do to this truck. . . . it makes me wonder what's going to — what's going to go out at 37,000 [miles]."

Murphy's damage numbers were the fruit of his fears. This contract verdict rests on a buyer's speculations about the future, not competent proof of fair market value at the time of sale. We should therefore reverse this judgment and remand for a new trial. Murphy deserves compensation based on competent evidence about the fair market value of his new but stolen truck on the day that he bought it.

GRIFFEN, J., joins.

ROBBINS and HEFFLEY, JJ., join part 2.