2009 Ark. App. 692

**QHG OF SPRINGDALE, INC., Appellant**

v.

**Ernest ARCHER, M.D., Appellee.**

**No. CA 07–1115.**

Court of Appeals of Arkansas.

Oct. 21, 2009.

Rehearing Denied Dec. 9, 2009.

Littler Mendelson, P.C., Fayetteville, by: Eva C. Madison, for appellant.

Law Office of Tina M. Damron, PLLC, Rogers, by: Tina M. Damron, for appellee.

D.P. MARSHALL JR., Judge.

This case illustrates the proverb: When a piece of paper blows into a law court, it may take a yoke of oxen to drag it out. The main piece of paper in this case is the 2002 employment contract between Dr. Ernest Archer, an OB/GYN, and his hospital-employer, QHG of Springdale.

## I. Statement of Facts

Dr. Archer and QHG entered into their first employment contract in 2000. The parties operated under this agreement for two years. In October 2002, after much negotiation, the parties rescinded the first agreement and entered into a new one. The new agreement was a detailed five-year contract. This lawsuit turns on this second agreement.

Over time, Dr. Archer became dissatisfied with several aspects of his job. He claimed that QHG repeatedly denied his time-off requests for vacation and continuing medical education and failed to provide adequate personnel and equipment. Dr. Archer's chief complaint was QHG's failure to provide rotating call coverage. With the exception of a few weeks here and there, Dr. Archer was on call twenty-four hours a day, seven days a week for more than two years. In January 2004, exercising an option available to both parties under the contract, QHG terminated the employment relationship without cause upon 180–days' notice. The hospital sent Dr. Archer a letter, explaining that his termination would be effective in July 2004. Dr. Archer, however, resigned his medical staff privileges in May 2004 because he could no longer operate safely given problems with his hands. The next day, QHG terminated Dr. Archer for cause.

Dr. Archer then sued QHG. He alleged, among other things, that QHG broke the 2002 employment contract in several ways and that the hospital was unjustly enriched by him providing non-stop call coverage. These two claims were the core of the case at trial. The circuit court granted QHG's directed-verdict motion on the unjust-enrichment claim. Dr. Archer's breach-of-contract claim went to the jury, which found that QHG had violated the 2002 employment agreement and awarded Dr. Archer $387,500.00. QHG appeals the jury's award, and Dr. Archer cross-appeals the dismissal of his unjust-enrichment claim. At oral argument before this court, Dr. Archer said his cross-appeal was conditional on the outcome of QHG's appeal: if we affirm on direct appeal, then he abandons his cross-appeal.

## II. *Construing the Contract*

QHG argues first that the 2002 agreement permitted termination of Dr. Archer's employment for cause when he resigned his medical staff privileges. According to the hospital, it did not breach the agreement by terminating him and was therefore entitled to judgment as a matter of law. But this argument ignores the substantial evidence supporting the jury's conclusion that QHG made the first material breach.

Though Dr. Archer alleged that QHG committed several breaches, on appeal the parties concentrate on QHG's alleged failure to provide rotating call coverage. The parties' 2002 agreement contained this provision: "[Dr. Archer] shall provide on-call coverage on a rotating basis and shall be on call as shall be determined from time to time by agreement between [QHG] and [Dr. Archer]." We reject QHG's argument that the agreement imposed no obligation on the hospital to provide rotating call. 'No rotation' is not having call on a rotating basis. The premise of this provision is that there would be some rotation in Dr. Archer's call schedule.

The precise meaning of having call on a "rotating basis" was and is an open question—one that must be answered by the jury on Dr. Archer's unjust-enrichment claim, as we hold in resolving his cross-appeal. But this is not like the *Cagin* case, which QHG invokes, where the parties' contract was silent about rotating call. *Cagin v. McFarland Clinic, P.C.,* 456 F.3d 903, 905 (8th Cir.2006). QHG's Policy # 201 also undercuts the hospital's reading of this provision. The hospital's policy could not be clearer: "No physician is required to be on call 24/7."

The evidence presented at trial showed that Dr. Archer was on call around the clock. He began complaining to the hospital administration about this situation as early as May 2001. He testified in detail

about his repeated requests for rotating call coverage, the hospital's repeated failures to provide rotation, the hospital's denials of his requests for vacation and continuing-education absences, and the effect that the tremendous workload had on him.

The jury returned a general verdict in Dr. Archer's favor. We therefore cannot know what breach or breaches it found. Nonetheless, the damage award can only mean that QHG was in material breach of the 2002 contract. *Taylor v. George,* 92 Ark.App. 264, 272–73, 212 S.W.3d 17, 23–24 (2005). QHG's breach thus excused Dr. Archer's continued performance under the contract. *Continental Carbonic Products, Inc. v. Cohen,* 96 Ark.App. 305, 310–11, 241 S.W.3d 296, 301 (2006).

■ QHG argues that, in the face of any material breach, Dr. Archer had two options: he could seek affirmance remedies (such as damages) or disaffirmance remedies (such as rescission and restitution). Because Dr. Archer continued to perform under the contract even after QHG's breach, the hospital's argument continues, his later resignation of medical privileges was a breach that allowed QHG to terminate the contract immediately. According to the hospital, Dr. Archer could not continue performing his contractual duties, accept the benefits of the contract, and then, relying on QHG's earlier material breach, refuse to perform.

At trial, however, the parties agreed to instruct the jury with AMI Civil 2427. The court's instruction told the jury this: "A material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party. A material breach excuses the performance of the other party and allows that party to sue for damages on the whole contract." QHG did not seek, proffer, or mention AMI Civil 2437, which is the applicable instruction

"when the defendant contends that the plaintiff waived his right to claim a breach of contract by acceptance of benefits." And this kind of alleged waiver was a disputed question of fact for the jury in this case. *Stephens v. West Pontiac-GMC, Inc.,* 7 Ark.App. 275, 278, 647 S.W.2d 492, 493–94 (1983). QHG thus waived its waiver-of-breach argument.

■ Next, damages on the contract. In order to fix the appropriate measure of damages for Dr. Archer under the parties' agreement, we must first resolve the alleged tension between the contract's salary and termination provisions. Addendum # 2 to the contract states that Dr. Archer's annual salary for the first two years of the agreement would be $300,000.00. Handwritten out to the side is the following statement: "The first 18 months of this agreement are guaranteed." QHG and Dr. Archer agreed that the handwritten statement was part of their contract. Paragraph 3.2 of the contract allows either party to terminate the contract "without cause, at any time" upon 180–days' written notice. Dr. Archer says that, taken together, these two provisions are ambiguous. He argues further that the two provisions were meant to run consecutively. Here Dr. Archer relies on parol evidence in the form of a pre-contract letter from QHG's administrator. Dr. Archer concludes that QHG could not give him notice of a termination without cause until the eighteen-month period had run.

■ Whether the parties' contract is ambiguous is a question of law. *Western World Ins. Co. v. Branch,* 332 Ark. 427, 430, 965 S.W.2d 760, 761 (1998). We see no ambiguity, either patent or latent. These two provisions are reconcilable. QHG contends, and we agree, that the eighteen-month salary guarantee was essentially a severance package. If QHG

had decided to terminate the agreement with or without cause before the eighteen months had run, then Dr. Archer would still be paid for a full eighteen months. If the termination was without cause, then the timing of the notice determined whether the 180–day period ran consecutively or concurrently or both. To read the two provisions any other way would effectively strike the "without cause, at any time" termination provision—a provision available to both QHG and Dr. Archer—from the parties' agreement. "A construction which neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions." *Continental Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971) (citation omitted). We therefore reject Dr. Archer's arguments about ambiguity.

■ QHG also argues that, even if it was in breach, then the jury's award of $387,500.00 is adrift from the facts and the law and requires a new trial or remittitur. We agree. Generally, "damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached." *Deck House, Inc. v. Link*, 98 Ark.App. 17, 25, 249 S.W.3d 817, 824–25 (2007). Further, "[w]here a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to the notice period." 25 C.J.S. *Damages* § 110 (2009); *see also Knight v. Interco Inc.*, 873 F.2d 1125, 1128–29 (8th Cir.1989) (applying Arkansas law); 11 Samuel Williston, A Treatise on the Law of Contracts § 1359, at 311 (Walter H.E. Jaeger ed., 3d ed.1968). Here, the parties capped the damages recoverable on their contract by including the reciprocal termination provision allowing either party to end this contract upon 180–days'–written notice.

■ Recognizing that the jury's award of substantial damages to Dr. Archer is entitled to respect, we have considered whether we can affirm the resulting judgment as a restitutionary award on the contract. Restatement (Second) of Contracts § 236 (1981); Restatement (Third) of Restitution and Unjust Enrichment § 38 (Tentative Draft No. 3, 2004). We conclude, for two reasons, that we may not affirm on this basis. First, this kind of restitutionary award on the contract is available only where (in the Restatement's word) there was a "total" breach by the party on QHG's side of the contract. Restatement (Second) of Contracts § 236 (1981); Restatement (Third) of Restitution and Unjust Enrichment § 38 (Tentative Draft No. 3, 2004). There was no total breach or repudiation here. It is one of the quirks of this case that both parties continued performing notwithstanding QHG's breach.

Second, the jury did not decide this case on what are often called restitutionary damages on the contract. Restatement (Third) Of Restitution and Unjust Enrichment § 38 cmt. a (Tentative Draft No. 3, 2004). Instead, the jury spoke on Dr. Archer's expectancy. The circuit court charged the jury, as agreed by the parties, using AMI Civil 2442. The jury's award was thus made to put Dr. Archer in the position he would have been if both he and QHG had performed all their promises. The damages awarded were for Dr. Archer's expectancy of continued employment for the duration of the notice period, not for the value to QHG of his overperformance of services. The award therefore cannot be salvaged as restitution on the contract.

QHG and Dr. Archer executed the agreement in October 2002. Under the

eighteen-month salary guarantee, QHG had to pay Dr. Archer through April 2004 no matter what. In January 2004, QHG sent Dr. Archer the letter giving notice of its without-cause termination in 180 days. This 180–day period expired in the middle of July 2004. This was the earliest date that QHG could have ended Dr. Archer's employment without cause under the parties' agreement. And given the jury's conclusion that QHG's earlier breach was material, Dr. Archer's later resignation of his medical privileges has no legal consequence: his continued performance was excused. QHG paid Dr. Archer through early May 2004. Dr. Archer was therefore entitled to a bit more than two months of additional salary on the contract. On the direct appeal, we therefore reverse the damages awarded and remand. The circuit court must enter a remitted award consistent with our opinion.

### III. *Dr. Archer's Cross–Appeal & Unjust–Enrichment Claim*

What about QHG's failure to provide rotating call coverage and time off? Dr. Archer overperformed at QHG's demand. Damages for this overperformance, we conclude, must come as a *quantum meruit* award off the parties' contract. *See, e.g., Crawford v. Lee County School Dist.*, 64 Ark.App. 90, 97, 983 S.W.2d 141, 145 (1998). QHG's obligation to pay for these extra services is quasi-contractual, implied by law to prevent unjust enrichment. *Adkinson v. Kilgore*, 62 Ark.App. 247, 253–54, 970 S.W.2d 327, 330–31 (1998); *see generally* HOWARD W. BRILL, ARKANSAS LAW OF DAMAGES § 31:2 (5th ed.2004).

"[W]hen an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Klein v. Arkoma Production Co.*, 73 F.3d 779, 786 (8th Cir. 1996), *cert. denied*, 519 U.S. 816, 117 S.Ct.

65, 136 L.Ed.2d 27 (1996) (applying Arkansas law). The parties' 2002 agreement does not fully address rotating call. Under the agreement and QHG's policy, there had to be some rotation. Dr. Archer's providing round-the-clock call service was not the parties' bargain. Their contract, however, provides no yardstick for measuring the damages to Dr. Archer from QHG's breach. The parties made no express agreement about exactly how much rotation was required or the value of on-call services. Nor does the record demonstrate any tacit agreement that, if Dr. Archer provided on-call coverage beyond some point, then QHG was willing to be responsible for any resulting consequential damages to the doctor. *Cf. Bank of America, N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003).

As QHG points out, in general Arkansas law allows no unjust-enrichment claim where the parties have a contract. *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 612–13, 210 S.W.3d 101, 112 (2005); *Glenn Mechanical, Inc. v. South Arkansas Regional Health Center, Inc.*, 101 Ark.App. 440, 445, 278 S.W.3d 583, 587 (2008); *Friends of Children, Inc. v. Marcus*, 46 Ark.App. 57, 61, 876 S.W.2d 603, 605 (1994). But the general rule has "many exceptions." *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 605–06 (8th Cir.1999) (surveying and following Arkansas law) (Richard S. Arnold, J.). "The mere fact that there is a contract between the parties does not prevent the grant of restitution in an appropriate case." *Friends of Children*, 46 Ark.App. at 61, 876 S.W.2d at 605.

The *Friends of Children* court gave an illustrative, though not exhaustive, list of these kinds of cases: "Appropriate cases include those . . ." involving a rescission at law, the discharge of a contract by impos-

sibility or frustration of purpose, or contracting parties who make a fundamental mistake about something important in their agreement. *Ibid.* The *Servewell* court recognized, but declined to apply on the facts there, other exceptions: where contracting parties make some agreement about a matter or "if the circumstances surrounding the parties' dealings can be found to have given rise to an obligation to pay." 362 Ark. at 612–13, 210 S.W.3d at 112.

■ The almost-completed RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT contains a section on overperformance that voices the unifying legal principles behind all these exceptions. This section also captures precisely why this record made a case ⌊₁₁for the jury— notwithstanding the parties' contract—on Dr. Archer's unjust-enrichment claim. The section is entitled "Performance of Disputed Obligation."

> If one party to a contract demands from the other a performance that is not in fact due by the terms of their agreement, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35(1) (Tentative Draft No. 3, 2004). All the exceptions reflect the limits of the reasons behind the general rule. Where the parties have an enforceable contract that fully addresses a subject, they must proceed on that contract in resolving their differences. But where the contract fails on some basis, or does not fully address a subject, or disputed performance is compelled under protest, then the parties' contract is no bar to an unjust-enrichment claim for restitution. *Applied Pharmacy,* 182 F.3d at 609.

■ We turn, with this law in mind, to the facts here. In reviewing the directed verdict, we consider the record in the light most favorable to Dr. Archer's unjust-enrichment claim. *Woodall v. Chuck Dory Auto Sales, Inc.,* 347 Ark. 260, 264, 61 S.W.3d 835, 838 (2001). The 2002 agreement required some call rotation. That requirement echoed QHG's policy that no doctor had to work 24/7. QHG demanded that Dr. Archer be on call all the time. He was. Early and often, however, Dr. Archer protested. He repeatedly asked QHG to relieve this burden. When the parties signed the 2002 agreement, another OB/GYN was working at QHG. This doctor's work was questionable; Dr. Archer was not comfortable rotating call ⌊₁₂with her, and QHG eventually terminated her. Both QHG and Dr. Archer expected the hospital to hire more OB/GYNs over time, more hands that could have helped cover call. As events played out, however, with the exception of a few weeks here and there, Dr. Archer was on call by himself for more than two years.

Why was rotating call coverage important? Because of the strong public policy requiring doctors to take care of their patients who need medical care. The Congress recognized this policy when it passed EMTALA, the Emergency Medical Treatment and Active Labor Act.* 42 U.S.C. § 1395dd (2006). Congress's purpose in enacting this statute is clear:

---

* The heading of this statute now reads Emergency Medical Conditions and Women in Labor. *See* 42 U.S.C. § 1395dd (2006). But the statute is still—almost uniformly—called by its original acronym, EMTALA. *See, e.g., Rob-* erts *v. Galen of Virginia, Inc.,* 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999); *Thompson v. Sparks Regional Medical Center,* 2009 Ark.App. 190, 302 S.W.3d 35.

Congress enacted EMTALA in response to its concern that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized. Through EMTALA, Congress sought to provide an adequate first response to a medical crisis for all patients.

*In re Baby K,* 16 F.3d 590, 593 (4th Cir. 1994) (internal citations omitted).

QHG knew its EMTALA duties. The hospital made its own rules for doctors in Policy # 201 to ensure statutory compliance. These rules required that "[o]n call physicians must respond within a reasonable period of time," which usually meant thirty minutes. Policy # 201 established care guidelines for the services each emergency patient should receive and the on-call doctor's immediate and future duties to that patient. QHG's Policy also listed some of the potential penalties for an on-call physician's failure to comply with EMTALA: substantial personal fines, suspension of medical staff privileges, and investigation by peers and the Board of Medical Examiners.

Dr. Archer's obligations and potential penalties under EMTALA and QHG's policies hamstrung him into abiding by QHG's unrelenting call schedule. He overperformed for good reasons and under protest. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35(1) (Tentative Draft No. 3, 2004). The parties' 2002 agreement required him to be on call, but gave no particulars other than requiring some rotation. This indefiniteness created hurdles for a claim on the contract. *Cf. Applied Pharmacy,* 182 F.3d at 609. The precise terms of performance due from both parties on rotating call were disputed. Finally, while the legal risks and costs of nonperformance by Dr. Archer to him and

QHG were substantial, his overperformance during their dispute insured that their patients received prompt medical care. *See generally* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 35 cmt. a (Tentative Draft No. 3, 2004).

This record, viewed in the light most favorable to Dr. Archer, shows that QHG has received something of value "under such circumstances that, in equity and good conscience, [the hospital] ought not to retain it." *Friends of Children,* 46 Ark. App. at 61, 876 S.W.2d at 606 (citation omitted). All the circumstances surrounding QHG's and Dr. Archer's dealings give rise to QHG's obligation to pay him something more. *Servewell Plumbing,* 362 Ark. at 613, 210 S.W.3d at 112. It was for the jury to say how much more. *First National Bank of DeWitt v. Cruthis,* 360 Ark. 528, 535–37, 203 S.W.3d 88, 93–94 (2005). The circuit court therefore erred by directing a verdict on unjust enrichment. We reverse the court's judgment on that claim and remand for a trial on the merits.

Reversed and remanded on direct appeal and on cross-appeal.

GLADWIN, ROBBINS, KINARD, and GRUBER, JJ., agree.

VAUGHT, C.J., and PITTMAN, BAKER, and BROWN, JJ., dissent.

WAYMOND M. BROWN, Judge, dissenting.

The majority begins its opinion with a proverb about the need for a yoke of oxen to pull a piece of paper out of a court. Yet, the only ones that might use that yoke are the members of the majority. The jury was able to listen to the evidence, deliberate, and reach a verdict. This verdict was supported by the evidence presented, and there is absolutely no reason for this court to remand this case for trial

before a second jury. Therefore, I must respectfully dissent.

I begin with what is noticeably absent from the majority's opinion: a discussion of this court's standard of review. QHG appeals from the denial of a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial or remittitur. In reviewing the denial of a motion for JNOV, this court views the evidence in the light most favorable to the party on whose behalf judgment was entered and reverses only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law. *Ethyl Corp. v. Johnson,* 345 Ark. 476, 49 S.W.3d 644 (2001). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.* It is not our place to try issues of fact; rather, we simply review the record for substantial evidence to support the jury's verdict. *Id.*

This court's review of a motion for new trial depends upon the grounds upon which the moving party requests the new trial as well as whether the motion was granted or denied. In this case, QHG argued that a new trial was in order because the amount of the jury's verdict was excessive, appeared to have been given under the influence of passion or prejudice, was clearly contrary to the preponderance of the evidence or contrary to the law, or was the result of error in the assessment of the amount of recovery. *See* Ark. R. Civ. P. 59(a)(4), (5), & (6). When reviewing a motion for new trial based on the ground that the verdict is clearly against the preponderance of the evidence, the circuit court has limited discretion because it may not substitute its view of the evidence for the jury's except when the verdict is clearly against the preponderance of the evidence. *Switzer v. Shelter Mut. Ins. Co.,*

362 Ark. 419, 208 S.W.3d 792 (2005). When reviewing the denial of such motion, we must affirm if the verdict is supported by substantial evidence. *Id.* Where an award of damages is alleged to be excessive, this court reviews the proof and all reasonable inferences most favorably to the appellee and determines whether the verdict is so great as to shock the conscience of the court or demonstrates passion or prejudice on the part of the jury. *Vaccaro Lumber v. Fesperman,* 100 Ark. App. 267, 267 S.W.3d 619 (2007). Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *Id.* Again, this court reviews the motion under the substantial-evidence standard. *See id.* Finally, when a party alleges that the jury erred in assessing the amount of the recovery, the denial of the motion for new trial is upheld absent a manifest abuse of discretion. *Home Mut. Fire Ins. Co. v. Jones,* 63 Ark.App. 221, 977 S.W.2d 12 (1998). An important issue is whether a fair-minded jury could have fixed the award at the challenged amount. *Luedemann v. Wade,* 323 Ark. 161, 913 S.W.2d 773 (1996).

The majority's opinion is flawed in two major aspects. First, the majority is incorrect in holding that the contract's salary provisions were unambiguous. When the terms of a contract are ambiguous and capable of having more than one meaning, extrinsic evidence is permitted to establish intent of the parties, and the meaning of the contract then becomes a question of fact. *Vogelgesang v. U.S. Bank, N.A.,* 92 Ark.App. 116, 211 S.W.3d 575 (2005). An ambiguity may be patent (apparent on its face) or latent (arise due to undisclosed facts or uncertainties in the written instrument). *Pittman v. Pittman,* 84 Ark.App. 293, 139 S.W.3d 134 (2003). The initial determination of the existence of an ambiguity rests with the court, and if the con-

tract is found to be unambiguous, its construction and legal effect are questions of law to be determined by the court. *Cranfill v. Union Planters Bank,* 86 Ark.App. 1, 158 S.W.3d 703 (2004).

The contract in this case contains two clauses relevant to this appeal. Section 3.2 of the agreement provides, "Either party may terminate Physician's employment hereunder, without cause, at any time upon one hundred eighty (180) days prior written notice to the other party." Meanwhile, Addendum #2 sets forth Dr. Archer's salary under the agreement: "Years one and two: $300,000. The first 18 months of this agreement are guaranteed. Years three through five: $265,000 [plus an incentive bonus]." The parties disputed whether the 180–day period for termination without cause ran consecutive to or concurrent with the eighteen-month salary guarantee. To support his argument, Dr. Archer presented a letter from Donnie Frederic, QHG's chief operating officer, indicating that the 180–day period for termination without cause would not begin until after the expiration of the eighteen-month guaranteed period.

To use another proverb, the majority puts the cart (the interpretation of the contract) before the horse (the determination of whether the agreement is ambiguous). The only analysis the majority provides for its holding that the agreement was unambiguous is its conclusion that the two clauses are reconcilable. The majority then reconciles the agreement in the light it believes to be correct. But the initial question is whether there is an ambiguity. The majority's interpretation, while reasonable, is not the only way the two clauses could have been construed. If the majority's interpretation is accepted as the only reasonable one, then Dr. Archer could have terminated the agreement without cause during the 180–day period, and QHG would have still been responsible for paying his salary. This interpretation is patently absurd, yet it necessarily follows from the majority's argument. Because the clauses were subject to more than one reasonable interpretation, the determination of the meaning of the contract fell within the province of the jury. I cannot agree with the majority's conclusion to the contrary.

Second, the majority's analysis regarding damages is incorrect. A party to a contract who is injured by its breach is entitled to compensation for the injury sustained and is entitled to be placed, insofar as this can be done with money, in the same position he would have occupied if the contract had been performed. *Moore v. Pulaski County Special Sch. Dist.,* 73 Ark.App. 366, 43 S.W.3d 204 (2001).

The majority's opinion focuses on QHG's material breach: the failure to provide adequate on-call coverage. But QHG also breached the agreement by denying Dr. Archer leave for vacation and continuing medical education and by failing to provide him adequate support personnel and equipment. The jury had before it testimony from Dr. Archer's expert witness, Donald Market, who presented a report about the value of the extra services Dr. Archer performed. Market calculated the value of Dr. Archer's past and future lost earnings ($824,539 as of the date of trial; $1,028,544 over the course of the contract), excess call necessitated by another doctor's refusal to participate in call ($861,267), excess performance of baby deliveries ($75,602), excess office calls ($41,625), and Dr. Archer's worth to QHG when all of the OB/GYN duties were assumed by him ($316,055). In other words, Market believed that Dr. Archer was entitled to in excess of $2 million in damages. The jury awarded $387,500. This award is supported by substantial evidence, and it nei-

ther has the appearance of being influenced by passion or prejudice nor is shocking to the conscious of the court. While we can never know how the jury arrived at its figure, we are not required to specifically determine how a jury arrived at its determination of damages to affirm. *See Luedemann, supra* (affirming a verdict of over $13,000 in damages, despite the plaintiff claiming over $35,000 in damages, in light of the jury finding the plaintiff 20% at fault and concluding that the jury did not have to believe ⌊₁₉her testimony); *Bull Motor Co. v. Murphy,* 101 Ark.App. 33, 270 S.W.3d 350 (2007) (affirming a $7000 jury award in a breach-of-contract for the sale of a "new" truck when the owner of the truck opined that the value of a truck he purchased diminished $8000 to $10,000 after being driven by a car thief). The jury has latitude in awarding damages when arriving at a figure. *Bank of America, N.A. v. C.D. Smith Motor Co.,* 353 Ark. 228, 106 S.W.3d 425 (2003).

The damages are supported by the record and should be affirmed. I would affirm and, per Dr. Archer's concession at oral argument, hold that the cross-appeal is moot. Because the majority of my colleagues disagree, I must respectfully dissent. I am authorized to state that Chief Judge Vaught and Judges Pittman and Baker join in this dissent.