**OPTICAL PARTNERS, INC., d/b/a Pearle Vision, Appellant,**

v.

**Kevin DANG d/b/a Dang Eye Care & Associates, P.A., Appellee.**

**No. 10–629.**

Supreme Court of Arkansas.

April 14, 2011.

John Randolph Shock, Fort Smith, for appellant.

Michael Jered Medlock, Fort Smith, for appellee.

JIM GUNTER, Justice.

Appellant Optical Partners, Inc., doing business as Pearle Vision, appeals two orders of the Sebastian County Circuit Court: (1) an order entered on June 5, 2009, denying appellant's motion for an emergency temporary restraining order and declaring the covenant not to compete valid in certain respects but unenforceable for lacking a legitimate business interest to protect, and (2) the verdict and judgment filed on February 18, 2010, following a bench trial wherein the circuit court determined that appellee Kevin Dang, doing business as Dang Eye Care & Associates, breached his lease agreement with appellant and owed damages for underpaid rent, unpaid rent, and lost profits. Appellee cross appeals on the issue of damages, asserting that lost profits should have been calculated differently. We affirm on both direct appeal and cross-appeal.

This case involves a covenant not to compete embedded in a lease agreement between appellant and appellee. Appellant is a business that manufactures and dispenses eyeglasses. Appellee is an optometrist who performs eye exams, writes prescriptions for glasses and contact lenses, and diagnoses and treats eye diseases. Appellee leased office space and equipment from appellant since August 1, 2000. The initial lease required appellee to assign all of his gross proceeds to appellant in return for a six-figure guaranteed amount and required appellee to be physically present at the location during specific business hours. On October 1, 2003, appellee signed a new lease agreement with appellant. The 2003 agreement was automatically renewed each year unless terminated by written thirty-day notice. The agreement provided that appellant and appellee were independent contractors and that neither party was employee, agent, joint venturer, or partner of the other. Appellee assumed more of the costs of equipment and staff than he did under the original lease, and the new lease required appellee to pay ten percent of his gross sales per month as rent. The 2003 agreement included the following covenant-not-to-compete provision:

> During the term of this Agreement and for one (1) year thereafter, Sublessee agrees that s/he will not engage in the practice of optometry or the dispensing of optical products as a sole practitioner, partner, employee, contractor, or sublessee of any person or entity or in any other capacity within a radius of three (3) miles from the Subleased Premises.

On May 11, 2009, appellant filed a complaint against appellee alleging appellee breached the lease agreement by failing to properly account for or pay the proper percentage of his gross sales per the agreement; by abandoning the agreement without proper notice on February 21, 2009; by absconding with the business telephone numbers owned by appellant; and by resuming business operations in violation of the covenant not to compete. As damages, appellant requested unpaid and underpaid rent based on appellee's gross sales, loss of income due to appellee's improper termination of the agreement, loss of business due to appellee's taking of the telephone numbers, and continuing loss of income as a result of appellee's breach of the noncompete clause. Contemporaneous with the complaint, appellant filed a Motion for Emergency Temporary Restraining Order, in which it al-

leged that it suffered irreparable harm as a result of appellee's abandoning the agreement, wrongfully withholding the telephone numbers, and breaching the covenant not to compete. Appellant contended that it had suffered a fifty-percent decrease in business income since February 21, 2009, as a result of appellee's actions.

Appellee filed an answer on May 14, 2009, denying all material claims appellant made in its complaint. Also on May 14, appellee filed a response to the motion for emergency relief, denying the allegations made therein, and a counterclaim for declaratory judgment asking the court to declare the restrictive covenant invalid under Arkansas law. Appellant responded to the counterclaim for declaratory judgment on May 28, 2009, asking that the court determine that the covenant was enforceable under the law and that the court deny appellee relief on that issue.

The court held a hearing on June 1, 2009. Dwight Rogers, co-owner with his wife Zoella of Optical Partners, testified that he had done business as Pearle Vision at the Fort Smith Central Mall location since 1993. He stated that his wife had been an optician for thirty-two years and explained that she fills eyeglass prescriptions, dispenses eyeglasses, and fits eyeglasses. Rogers admitted that his wife and appellee did not make referrals to each other, that his wife in no way regulated or controlled appellee's business, and that appellee's patients were free to use any optician. Rogers noted that being next door provided convenience for many of appellee's patients to use Pearle Vision to fill their prescriptions. Rogers testified that appellee was not an employee of Optical Partners or Pearle Vision. Rogers stated that his business was "complimentary" to appellee's business. Rogers described the contract between his business and appellee as a lease agreement for real property and equipment. Appellee's office space was physically located inside appellant's retail space. Rogers explained that when appellee first signed the lease agreement in 2000, he was fresh out of optometry school and had no patient base. Rogers explained that, prior to 2000, he and his wife had operated out of that location for seven years.

Rogers testified that Optical Partners operated under a franchise agreement with Pearle Vision in which Optical Partners paid nine percent of its gross income to Pearle Vision for advertising purposes. Seven percent of that amount was used for national brand advertising, and two percent of that amount was given back to Optical Partners for local advertising. Rogers testified that he used the two percent to advertise that his franchise had an independent optometrist on site and often advertised appellee by name. Rogers stated that on February 17, 2009, appellee stopped seeing patients at the Pearle Vision location and began practicing optometry less than three miles away at another location. Rogers said that appellee did not give written notice of his intent to terminate the lease agreement until April 17. Rogers stated that appellee's sister, Cindy Dang, replaced appellee as optometrist at the Pearle Vision location and that there was never a time period where appellant was without an optometrist on site.

On cross-examination, Rogers admitted that his business was not in direct competition with appellee's business. Rather, Rogers stated that appellee was competing with appellant by "taking away ... patients." However, Rogers acknowledged that those patients were free to use appellant for dispensing eyeglasses regardless of where appellee was located and that those patients were never required to use appellant to fill prescriptions written by appellee.

Appellee Kevin Dang testified that he was never appellant's employee, that he never bought any part of appellant's business, and that he never had any agreement to become a partner in that business. He said that he was an optometrist; that he wrote prescriptions for eyeglasses and contact lenses, and that he sold contact lenses; but that he did not have an optical lab to manufacture and fit eyeglasses. He stated that he was not in competition with appellant. Appellee maintained that he had no obligation to refer patients to appellant to fill prescriptions and, in fact, was prohibited by law from making such a referral. Appellee stated that he was currently leasing space from Eye Mart under a similar lease agreement that he had with appellant. Appellee stated that he orally notified appellant sixty days prior to his termination of the lease agreement that he was planning to leave. Appellee admitted that he did not give written notice until after he had terminated the lease agreement.

The circuit court entered an order on June 5, 2009, finding that appellee clearly violated the noncompete clause contained in the lease agreement by opening, within one year, an optometry office located less than three miles from appellant's place of business. However, the circuit court also found that the restrictive covenant was unenforceable under Arkansas law. The court relied on this court's holding in *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999), to find that appellant did not have a valid interest to protect because the covenant not to compete did not arise out of a contract of employment or contract for the transfer of goodwill or property. Without a valid interest, the circuit court found that the noncompete clause was unenforceable.

On January 21, 2010, appellee filed an amended answer in which he admitted that he had failed to properly account for the percentage of his gross income by which to calculate his rent; that he had abandoned the lease agreement on February 21, 2009; that he had given written notice of his intent to terminate the agreement on April 17, 2009; that he had retained ownership of the telephone number for a short period of time after he abandoned the agreement; and that he had resumed his business at a different location. Appellee admitted that he did not give written notice of his intent to terminate the agreement when he left on February 19, 2009. However, appellee claimed that any damages should be limited to thirty days after he gave oral notice, or alternatively, that "under any set of circumstances," damages should be limited to thirty days from April 17, 2009, the date when appellee gave written notice.

A bench trial was held on February 17, 2010, and the following relevant testimony was presented. Appellee acknowledged that the 2003 lease agreement contained language in paragraph four that he was required to pay ten percent of his gross income as rent each month; however, he asserted that he and appellant orally agreed in October 2007 that appellee's rent would be reduced to eight percent of his gross income. Appellee admitted that he underpaid appellant approximately $3000 from October 2007 until February 17, 2009, using the eight-percent figure, due to a mistake in calculating his gross income. Appellee testified that on February 17, 2009, he stopped operating under the 2003 lease agreement. He admitted that he did not provide written notice that he was terminating the agreement, but he stated that he gave appellant oral notice prior to his separation. Appellee later gave written notice on April 17, 2009. Appellee admitted that he did not pay rent to appellant from February 17 through May 17.

Dwight Rogers testified and took issue with appellee's contention that in October 2007, Rogers orally agreed to allow appellee to reduce his rent from ten percent of gross income to eight percent. Rogers claimed that appellee owed appellant two percent of his gross income that he failed to pay from October 2007 until May 2009. Rogers stated that he believed about sixty percent of appellee's due to his ownership of the Pearle Vision franchise, he kept up with monthly gross receipts of both the optician's side and the optometrist's side of the business. Those documents were admitted into evidence as plaintiff's exhibits. Rogers testified that those exhibits illustrated a dramatic decrease (seventy percent from the previous year) in appellant's business between February 2009 and May 2009. Calculating the numbers, Rogers determined that the amount of lost income for his business due to that time period was $63,096.29. Rogers asked the court to award him underpaid rent from October 2007 through February 17, 2009, in the amount of $14,941.04 (the difference between the ten percent of gross income required by the written contract and the eight percent appellee actually paid); unpaid rent for February 17, 2009, through May 17, 2009, in the amount of $10,729.16 (ten percent of appellee's gross income during that time period); lost profits from February 2009 through May 2009, in the amount of $63,096.29; and attorney's fees, costs, and pre- and post-judgment interest.

On cross-examination, Rogers admitted that in earlier sworn testimony he had said that he had made a oral agreement with appellee in October 2007 to reduce appellee's rent from ten percent of gross income per month to eight percent. Rogers said that he agreed to the change in rent because he was afraid appellee was going to leave his location next door to appellant. Rogers stated that even after giving his agreement orally, he believed that the written agreement controlled. Rogers admitted, however, that he always cashed the rent checks appellee paid, even those for the eight-percent amount. Rogers said that he never complained to appellee about the reduced rent amount and that he might not have ever complained except that appellee terminated their agreement. Rogers admitted that he received written notice of termination from appellee in April 2009 and that he had oral notification just prior to appellee's leaving in February 2009.

The circuit court entered a judgment on February 18, 2010, finding that appellee clearly breached the 2003 lease agreement by terminating it without written notice as provided by the terms of the agreement. The court determined that, based on appellee's admission that he had underpaid, appellant was entitled to $2938.23 for underpaid rent from October 1, 2007, until February 17, 2009, using the eight-percent calculation for rent based on Dwight Rogers's admission that the parties had orally agreed to reduce the rent from ten percent to eight percent. The circuit court noted that although appellant argued that the oral modification of the rent provision of the agreement lacked valuable consideration, appellee's forbearance in not terminating the agreement at that time qualified as consideration to modify the contract. The circuit court also found that appellee owed appellant for unpaid rent from the date of appellee's breach—February 17—until thirty days from the date of his actual written notice—May 17. Using appellant's estimate of $107,291.60 as appellee's gross sales during that time period (and the court noted that this appeared to be a conservative estimate of appellee's income), the court determined the amount of rent owed based on the eight-percent figure. The court then determined that appellee was entitled to a set-off in the

amount of rent paid by appellee's sister during that time period. Therefore, the circuit court determined that appellee owed $3458.33 in unpaid rent for the time period between February and May 2009. The court also found that appellant was entitled to recover the lost profits it could have reasonably expected to realize if appellee had not breached the contract. The court noted that appellant's financial records indicated an increase in income for the month of February, so the court awarded appellant $35,791.75 for calculated losses for March, April, and one-half of May minus the overage from February. The circuit court also awarded appellant attorney's fees in the amount of $10,409.58 and costs in the amount of $492.92.

On March 18, 2010, appellant filed a notice of appeal from the circuit court's June 5, 2009 order and February 18, 2010 judgment. Thereafter, on March 24, 2010, appellee filed a cross-appeal from the June 5, 2009 order and February 18, 2010 judgment.

### I.  Direct Appeal

Appellant's sole point on direct appeal is that the circuit court erred in finding that the covenant not to compete was unenforceable and thereafter ruling its breach inadmissible at a trial on the merits of appellee's breach of the lease agreement. Appellant argues that the circuit court too narrowly interpreted *Dawson* to stand for the proposition that a covenant not to compete is enforceable only if the underlying contract involves an employment relationship or transfer of goodwill or property. Appellant maintains that the circuit court neglected to recognize other valid interests that may be protected in contractual relationships.

Covenants not to compete, because they restrain trade, have been generally disfavored by courts. *Statco Wire-*

*less, LLC v. Sw. Bell Wireless, LLC*, 80 Ark. App. 284, 95 S.W.3d 13 (2003). At common law, covenants in restraint of trade were presumed invalid; however, the presumption could be overcome by a showing of reasonableness. *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 994 S.W.2d 468 (1999). A restraint of trade is said to be reasonable only when the restriction on one party is no greater than what is reasonably necessary to secure the interest of the party protected by the contract and is not so broad as to be injurious to the public interest. *Duffner v. Alberty*, 19 Ark. App. 137, 718 S.W.2d 111 (1986). In general, a covenant not to compete must meet three requirements: there must be a valid interest to protect; the time limit contained in the agreement must be reasonable; and the scope of the agreement must not be overly broad. *Rebsamen Ins. v. Milton*, 269 Ark. 737, 600 S.W.2d 441 (Ark.App.1980).

Without statutory authorization or some dominant policy justification, a contract in restraint of trade is unreasonable if it is based on a promise to refrain from competition that is not ancillary to a contract of employment or to a contract for the transfer of goodwill or other property. *HRR Ark., Inc. v. River City Contractors, Inc.*, 350 Ark. 420, 87 S.W.3d 232 (2002); *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999). The law will not protect parties against ordinary competition. *Id.* In a contract for the sale of an established business, the seller may agree not to compete in a particular area for a certain period of time. *McLeod v. Meyer*, 237 Ark. 173, 372 S.W.2d 220 (1963). In an employment contract, the employee may agree not to work for a similar business in a specified area after leaving the employer. *Id.* The context in which the covenant is found impacts this court's determination as to

the reasonableness of the covenant, as we have historically been more willing to enforce covenants not to compete where they are connected to the sale of a business. *Id.* Covenants not to compete directed at employees are more difficult to enforce because "[c]ourts are reluctant to uphold contracts whereby an individual restricts his right to earn a living at his chosen calling." *Am. Excelsior Laundry Co. v. Derrisseaux*, 204 Ark. 843, 846, 165 S.W.2d 598, 600 (1942) (quoting *Love v. Miami Laundry Co.*, 118 Fla. 137, 160 So. 32, 34 (1935)).

■■■■■ We have held that whether a restrictive covenant is reasonable or unreasonable is a matter to be determined under the particular circumstances involved. *McLeod, supra.* In determining whether a restraint of trade imposed by a contract is reasonable, we consider "whether it is such only as to afford a fair protection to the interests of the party in whose favor it is given, and not so large as to interfere with the interests of the public." *Evans* ⌐₁₂*Laboratories, Inc. v. Melder*, 262 Ark. 868, 870, 562 S.W.2d 62, 64 (1978) (quoting *Orkin Exterminating Co. v. Murrell*, 212 Ark. 449, 206 S.W.2d 185 (1947), and *Edgar Lumber Co. v. Cornie Stave Co.*, 95 Ark. 449, 130 S.W. 452 (1910)). Moreover, the burden is on the party challenging the validity of a covenant to show that it is unreasonable and contrary to public policy. *Dawson, supra.* We review cases involving covenants not to compete on a case-by-case basis. *Id.*

Here, the circuit court determined that the restrictive covenant was unreasonable because appellant did not have a legitimate business interest to protect, and we find no error in the circuit court's decision. Appellant admitted that it was not in direct competition with appellee and that their businesses served different functions and provided different services. Appellee was never allowed to refer patients to appellant, and appellee's patients were free to use any optician they chose to fill their prescriptions regardless of appellee's geographical location. Appellant also acknowledged that appellee's move to his new location did not prohibit his patients from continuing to use appellant's business. Appellant admitted that appellee was never an employee or partner and was always an independent contractor conveniently located within appellant's leasehold. As their businesses served complementary functions, customers often chose to use both appellant and appellee for convenience. However, appellee's patients were never required to use appellant's business, either during the lease or after its termination.

■■■ At a minimum, enforcement of a restrictive covenant requires that the parties have competing businesses as opposed to complementary businesses. We cannot say that the circuit⌐₁₃court erred in finding that appellant had no legitimate business interest to protect and that this restrictive covenant was unreasonable where appellant and appellee did not provide the same services and were not in direct competition; they continually held themselves out as independent businesses; and nothing prohibited appellee's patients from continuing to use appellant's location to fill prescriptions even after appellee's change in location. Although appellant urges this court to hold that the circuit court too narrowly interpreted *Dawson* as standing for the proposition that restrictive covenants are only enforceable where appurtenant to employment contracts or contracts for the sale of a business, we decline to do so because the circuit court did not err in finding that this restrictive covenant was unreasonable because appellant had no legitimate business interest to protect.

Appellant argues alternatively that the circuit court erred in not considering the legitimate business interests of goodwill provided by appellant to appellee during the pendency of the lease. Appellant maintains that it transferred the "goodwill" of its established client base at the mall location to appellee when the lease agreement was signed. Appellant is mistaken. At most, customers could choose to use appellee for eye-exam services due to the convenience of appellant and appellee being at the same location. The lease agreement contained no "goodwill" provision as often seen or implied in contracts for the sale of a business. *See, e.g., Clower v. Orthalliance, Inc.,* 337 F.Supp.2d 1322 (N.D.Ga.2004) (recognizing that under Georgia law, when a party sells his business, part of his compensation includes the sale of any goodwill bound up in his business); *Rice v. Hulsey,* 829 N.E.2d 87, 89–90 (Ind.App.2005) (contract explicitly provided for transfer of "all of the goodwill of the business").

## II. *Cross–Appeal*

Appellee argues on cross-appeal that the circuit court erred in finding that appellee owed appellant $35,791.75 in lost profits because the circuit court should have capped lost-profit damages from thirty days from appellant's actual notice of appellee's termination of the lease (February 17, 2009), and not thirty days from appellee's written notice of termination (May 17, 2009). Appellee relies on *QHG of Springdale, Inc. v. Archer,* 2009 Ark. App. 692, 373 S.W.3d 318, as standing for the proposition that the proper period of time is thirty days from the actual termination of the contract, whether that termination was with or without notice.

In bench trials, the standard of review on appeal is not whether there is substantial evidence to support the finding of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. Ark. R. Civ. P. 52(a) (2010); *Cochran v. Bentley,* 369 Ark. 159, 251 S.W.3d 253 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Sharp v. State,* 350 Ark. 529, 88 S.W.3d 848 (2002). Disputed facts and determinations of credibility are within the province of the factfinder. *Pre–Paid Solutions, Inc. v. City of Little Rock,* 343 Ark. 317, 34 S.W.3d 360 (2001).

In general, damages recoverable for breach of contract are those damages which would place the injured party in the same position as if the contract had not been breached. *Dawson,* 337 Ark. at 258, 987 S.W.2d at 728. Damages must arise from the wrongful acts of the breaching party. *Id.* Moreover, the judgment must have some relationship to the damages proved. *Id.* Consequential damages are defined as "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act." *Smith v. Walt Bennett Ford, Inc.,* 314 Ark. 591, 604–05, 864 S.W.2d 817, 825 (1993) (quoting *First Serv. Corp. v. Schumacher,* 16 Ark. App. 282, 702 S.W.2d 412 (1985)). Lost profits are recognized as a type of consequential damages. *Dawson,* 337 Ark. at 258, 987 S.W.2d at 728. In breach-of-contract cases, consequential damages are recoverable when they were fairly within the contemplation of the parties. *Id.* Although recovery will not be denied merely because the amount of damages is hard to determine, damages must not be left to speculation and conjecture. *Id.*

*Archer* provides no support for appellee's contention. In fact, it supports the opposite proposition—that damages for breach of contract are those that would place the injured party in the same position as if the contract had not been breached. *See Archer,* 2009 Ark. App. at 17–18, 373 S.W.3d at 328–29. Here, the circuit court attempted to do just that, capping lost-profit consequential damages at thirty days from the day of written notice of termination, which was required by the lease agreement. On these facts, we are satisfied that the circuit court did not clearly err in assessing lost-profit damages.

Affirmed on direct appeal; affirmed on cross-appeal.