# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1970

_____

Stuart C. Irby Company, Inc.

*Plaintiff - Appellant*

v.

Brandon Tipton; Wholesale Electric Supply Company, Inc.; John Doe, 1-5;
Michael Gilbert; Stephen Padgett; Kurt Blumfelder; Gary Cummings

*Defendants - Appellees*

_____

No. 14-2682

_____

Stuart C. Irby Company, Inc.

*Plaintiff - Appellant*

v.

Brandon Tipton; Wholesale Electric Supply Company, Inc.; John Doe, 1-5;
Michael Gilbert; Stephen Padgett; Kurt Blumfelder; Gary Cummings

*Defendants - Appellees*

_____

Appeals from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 16, 2015
Filed: August 6, 2015

_____

Before WOLLMAN and GRUENDER, Circuit Judges, and GRITZNER,[1] District Judge.

_____

GRUENDER, Circuit Judge.

In this appeal, we consider claims brought by an employer after several of its employees left to work for a competitor. The district court granted summary judgment to the defendants on all claims and awarded them attorneys' fees and costs. We conclude that granting summary judgment to the defendants was inappropriate and that the award of attorneys' fees and costs must be vacated.

## I.   Background

Brandon Tipton, Michael Gilbert, and Steven Padgett worked for Treadway Electric Company, Inc. ("Treadway"), a distributor of electrical products. Tipton initially worked for Treadway in its office in Little Rock, Arkansas and later became the branch manager for its Conway, Arkansas location. Gilbert and Padgett worked as inside salesmen for Treadway in Conway. While working for Treadway, Tipton, Gilbert, and Padgett each signed agreements that contained the following non-compete provision:

> [I]f and when you leave Treadway's employ, for whatever reason, you will not compete with Treadway or its subsidiaries by soliciting or accepting business from Treadway's customers within your territory, as

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

defined by Treadway Electric Company, for at least one (1) year after leaving; and . . . you will not solicit the employment of any Treadway representatives for at least one (1) year after leaving.

Thereafter, Stuart C. Irby Company, Inc. ("Irby") became interested in purchasing many of Treadway's assets, and an asset purchase agreement ("APA") was signed on December 8, 2011. The APA stated that Treadway "will assign and transfer to [Irby] . . . all of [Treadway's] rights, title and interests in and to, and [Irby] will take assignment of and assume, all rights and interest in and obligations under the Assigned Contracts." Irby's chief operating officer has averred that Tipton's, Gilbert's, and Padgett's non-compete agreements were assigned to Irby. Indeed, when Treadway and Irby discussed which contracts would be assigned, they discussed the non-compete agreements, and Treadway's president showed Tipton's agreement to Irby.

The APA took effect on January 1, 2012, at which time Tipton, Gilbert, and Padgett became Irby employees. Irby retained them with essentially the same benefits and seniority. For the employees, the transition from Treadway to Irby appears to have been seamless. Tipton testified that Irby's business was the same as Treadway's had been. As a branch manager for Irby, Tipton directed the office's operations, including sales, delivery of products, and administrative activities. Tipton interacted daily with customers, even taking them out for meals and on annual fishing trips. As inside salesmen for Irby, Gilbert and Padgett also dealt with customers on a regular basis.

After working for Irby for about one year, Tipton began talking with Kurt Blumfelder, the Executive Vice President of Wholesale Electric Supply Company, Inc. ("Wholesale"). Tipton admitted that Wholesale did "pretty much the same thing" as Irby, and Blumfelder likewise acknowledged that the companies were competitors

in Arkansas. On March 14, 2013, Tipton announced that he was leaving Irby to work for Wholesale. The next day, Gilbert and Padgett did the same.

What happened in advance of these resignations forms the core of this case. During his deposition approximately eight months after he left Irby, Tipton had very little recollection about any conversations he had with Blumfelder about coming to work for Wholesale. Tipton did not remember whether he had informed Gilbert and Padgett about a meeting he had with Blumfelder. Nor could Tipton recall whether he told Blumfelder that he should hire Gilbert and Padgett. Blumfelder, however, testified that he spoke with Tipton by telephone "a number of times" in early 2013 about him coming to work for Wholesale. Tipton acknowledged that he was "[p]ossibly looking for employment" if he was talking to Blumfelder around this time. On January 5 and 8, the following text-message exchange occurred:

> Blumfelder: Interested in meeting tomorrow AM or lunch; Or Thursday . . . I can meet anytime 11AM-9PM . . . In Conway or Little Rock . . . Let me know if you guys r available any of these times please. Thanks.
>
> Tipton: Thursday would be better.
>
> Blumfelder: Ok great. Are you guys able to come to Little Rock to see our place or would you prefer to meet in Conway?

And on January 29, the following text-message exchange occurred:

> Tipton: What time does everyone leave the store in conway[?]
>
> Blumfelder: I'll chase them out at 5 and will be there waiting on you guys. What beer u like[?]

Furthermore, when asked whether he talked with Gilbert and Padgett about leaving Irby and going to Wholesale, Tipton admitted that he met with them and Blumfelder on March 13, the day before Tipton resigned from Irby. Tipton did not remember whether he had spoken to Gilbert and Padgett about leaving Irby before then.

Irby sued Tipton, Gilbert, Padgett, Blumfelder, and Wholesale asserting claims for breach of fiduciary duty, breach of contract, civil conspiracy, and tortious interference with a contract.[2] On cross-motions for summary judgment, the district court granted summary judgment to the defendants on all claims. The court then awarded the defendants in excess of $200,000 in attorneys' fees and costs. Irby appeals both rulings.

## II.     Discussion

### A.

We review the district court's grant of summary judgment *de novo*, *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 849 (8th Cir. 2014), affirming if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). To survive a summary-judgment motion, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The parties agree that Arkansas substantive law applies here. Consequently, we

---

[2]Irby also sued Gary Cummings, another Wholesale employee, but Irby's briefs on appeal do not contest the district court's decision to dismiss the claims against Cummings.

"apply decisions of the Arkansas Supreme Court construing Arkansas law, and we attempt to predict how that court would decide any state law questions that it has not yet resolved." *G&K Servs. Co, Inc. v. Bill's Super Foods, Inc.*, 766 F.3d 797, 800 (8th Cir. 2014).

### 1.     Breach of Fiduciary Duty

Irby first argues that the district court erred in granting summary judgment on its fiduciary-duty claim against Tipton. As the branch manager of Irby's Conway office, Tipton owed a fiduciary duty to Irby. *See Pennington v. Harvest Foods, Inc.*, 934 S.W.2d 485, 495 (Ark. 1996) ("[A] manager owes a fiduciary duty to his business."); *Tandy Corp. v. Bone*, 678 S.W.2d 312, 318 (Ark. 1984) (same). The parties disagree about whether a trial is necessary to determine if Tipton abided by that duty.

Irby contends that Tipton breached his fiduciary duty by recruiting Gilbert and Padgett to join Wholesale. "Arkansas law strikes a careful balance between an employer's right to employee loyalty, and an employee's right—absent contrary contractual commitment—to resign and pursue his career with a competing employer." *Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 788 (8th Cir. 1996). Under Arkansas law, "[e]ven corporate officers and directors, who have fiduciary duties to the corporation beyond those of less essential employees, are free to resign and go into competition, so long as they remain loyal prior to resigning." *Id.* And a corporate fiduciary, while still employed, is free to notify his colleagues and his employer's customers of his intent to leave. *Id.* However, before resigning, a manager has a duty of loyalty that "preclude[s] him from soliciting other employees or customers to leave [the employer] with him." *Id.*

We conclude that a trial is necessary to determine whether Tipton, while still employed by Irby, solicited Gilbert and Padgett to leave for Wholesale. Tipton spoke

with Blumfelder by telephone "a number of times" in early 2013 about joining Wholesale. In January 2013, Blumfelder and Tipton exchanged text messages to arrange a meeting for "you guys" at which Blumfelder would provide beer and a tour of Wholesale's facility. A reasonable jury could conclude that the "guys" for whom Tipton was arranging a meeting included Gilbert and Padgett, especially because Blumfelder admitted that he was interested in meeting them. Furthermore, a reasonable jury could infer that by arranging a meeting with Blumfelder that involved beer and a tour of Wholesale's facility, Tipton was trying to convince Gilbert and Padgett to join Wholesale with him. *See Anderson*, 477 U.S. at 248. Tipton could not recall whether he asked Blumfelder to hire Gilbert and Padgett, but Tipton admits that, before he left Irby, he met with them to discuss leaving Irby to become Wholesale employees. This meeting, which Blumfelder attended, occurred on March 13, the day before Tipton resigned. Tipton could not recall whether this was the first time that he had discussed leaving Irby with Gilbert and Padgett.

We acknowledge that Tipton's conduct may have been consistent with his duty of loyalty. In the absence of a contractual commitment (a topic discussed below in Part II.A.2), Tipton was free to explore other employment options, including with a competitor like Wholesale. *See Vigoro*, 82 F.3d at 788-79. And Tipton was not required to keep his departure from Irby a secret. *See id.* That said, making all reasonable inferences in favor of Irby, we conclude that a reasonable jury could find that Tipton crossed the line between discussing his intent to leave Irby with Gilbert and Padgett and recruiting them to follow him to Wholesale. *See Anderson*, 477 U.S. at 248. We therefore disagree with the district court's finding that there is "nothing in the record" to suggest that Tipton disregarded his duty of loyalty. Irby has presented sufficient evidence to create a genuine dispute of material fact.

## 2.    Breach of Contract

Irby next argues that Tipton, Gilbert, and Padgett breached their non-compete agreements. The district court granted summary judgment on this claim for three reasons. First, the court found that although the non-compete agreements were "arguably assigned" to Irby, there was no evidence that Tipton, Padgett, or Gilbert breached their agreements. No such evidence existed, the court explained, because the non-compete agreements' one-year period was triggered when Tipton, Gilbert, and Padgett became Irby employees and because they did not join Irby's competitor, Wholesale, until more than one year later. Second, the court found that the non-compete agreements were unenforceable because they did not protect a legitimate business interest. Finally, the court determined that the non-compete agreements were unenforceable due to the lack of a reasonable geographic limitation.

We begin with the threshold question of whether Arkansas law permits the assignment of an employee's non-compete agreement to a successor employer. The district court did not reach this issue, and the parties have not directed us to an instance where the Arkansas Supreme Court has decided the question. State courts are split on this issue, with the majority rule being that a covenant not to compete can be assigned to a successor employer. 6 Williston on Contracts § 13:13 (4th ed. 1990). We predict that the Arkansas Supreme Court would adopt the majority rule that a covenant not to compete can be assigned. *See Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 928-30 (6th Cir. 2000) (making a similar prediction under Kentucky law). While it is true that Arkansas law is generally skeptical of covenants not to compete, *see, e.g.*, *Duffner v. Alberty*, 718 S.W.2d 111, 112 (Ark. Ct. App. 1986) (en banc), Arkansas courts also recognize the legitimate roles that non-compete agreements can play. For example, a covenant not to compete can protect a business against the appropriation of its customers, *Borden, Inc. v. Huey*, 547 S.W.2d 760, 761-62 (Ark. 1977), or against the loss of its trade secrets, *Orkin Exterminating Co. of Ark. v. Murrell*, 206 S.W.2d 185, 189-90 (Ark. 1947). Permitting the assignment

of non-compete agreements is in keeping with preserving these legitimate business interests. We also note that the Arkansas Supreme Court has spoken favorably about allowing the assignment of a covenant not to re-engage in business, *Bledsoe v. Carpenter*, 254 S.W. 677, 678 (Ark. 1923), a different but analogous contract right, *see Madison Bank & Trust v. First Nat'l Bank of Huntsville*, 635 S.W.2d 268, 270-73 (Ark. 1982). For these reasons, we predict that the Arkansas Supreme Court would follow the majority rule by allowing a covenant not to compete to be assigned to a successor employer.

This conclusion leads to the question of whether Tipton's, Gilbert's, and Padgett's non-compete agreements were validly assigned. "Whether an assignment of contract rights has occurred is determined by the intent of the parties; the assignor must intend to transfer a present interest in the subject matter of the contract." *Beal Bank, S.S.B. v. Thornton*, 19 S.W.3d 48, 51 (Ark. Ct. App. 2000) (quoting 6 Am. Jur. 2d *Assignments* § 135 (1999)); *see also Koch v. Compucredit Corp.*, 543 F.3d 460, 465 (8th Cir. 2008). Assignment is a question of fact. *Beal Bank*, 19 S.W.3d at 51. We agree with the district court's conclusion that the non-compete agreements were "arguably assigned." The APA indicates that Treadway assigned some of its contracts to Irby. Irby's chief operating officer sought to eliminate the APA's ambiguity by averring that the non-compete agreements were assigned to Irby. This statement is consistent with record evidence that, while discussing the assignment of contract rights, Treadway and Irby discussed the non-compete agreements, at which point Treadway's president showed Tipton's agreement to Irby. This evidence about assignment is not conclusive, but it is sufficient to generate a genuine dispute of material fact about whether Treadway assigned the non-compete agreements to Irby.

We turn now to the legal effect of this assignment of contract rights. The general rule is that "an assignment operates to place the assignee in the shoes of the assignor, and provides the assignee with the same legal rights as the assignor had before assignment." *Cascades Dev. of Minn. LLC v. Nat'l Specialty Ins.*, 675 F.3d

1095, 1099 (8th Cir. 2012) (alteration and emphasis omitted) (quoting *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 803 (Minn. 2004)); *see Citibank, N.A. v. Tele/Res., Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) ("Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor."). An assignment of contract rights is a "separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." *Citibank*, 724 F.2d at 269.

The district court found that Irby only partially stepped into Treadway's shoes as a result of the assignment, reasoning that Irby could enforce the non-compete agreements against Tipton, Padgett, and Gilbert but only could do so for one year after they left Treadway's employ. The court reached this conclusion because it found that becoming Irby employees after the asset sale triggered the beginning of the non-compete agreements' one-year period. As a result of this approach to the assignment, the district court determined that the non-compete agreements had expired by the time Tipton, Gilbert, and Padgett left Irby to work for Wholesale in March 2013. The district court offered no legal support for this peculiar result, and we see no reason to deviate from the normal manner in which the assignment of contract rights operates. Consequently, we conclude that if the non-compete agreements were in fact assigned to Irby, it fully stepped into Treadway's shoes and received Treadway's rights "in full force and effect as to the party charged." *Id.* Following the assignment, "[t]he only thing that changed was the entity now entitled to enforce the terms and conditions that [Tipton, Gilbert, and Padgett] had previously agreed to when [they] entered into [the non-compete] agreement[s]." *See Kethan*, 209 F.3d at 927-28. Thus, if the non-compete agreements were assigned, we conclude that Irby had the ability to enforce them for one year after Tipton, Gilbert, and Padgett resigned from Irby.

-10-

This brings us to the district court's alternative conclusion that the non-compete agreements are unenforceable under Arkansas law. Generally, a non-compete agreement must meet three requirements to be enforceable: "(1) the [employer] must have a valid interest to protect; (2) the geographical restriction must not be overly broad; and (3) a reasonable time limit must be imposed." *Duffner*, 718 S.W.2d at 112. The validity of a covenant not to compete depends upon the facts and circumstances of each case. *Optical Partners, Inc. v. Dang*, 381 S.W.3d 46, 53-54 (Ark. 2011). The district court held that the non-compete agreements were overbroad, and thus unenforceable, because they did not protect a valid interest and because they lacked a reasonable geographic limitation.

The district court concluded that it "appears" that the only interest protected by the non-compete agreements was ordinary competition. *See Bendinger v. Marshalltown Trowell Co.*, 994 S.W.2d 468, 472 (Ark. 1999) ("[T]he law will not protect parties against ordinary competition."). Irby counters that a covenant not to compete validly can protect an employer against the loss of its customers. This is true.

> The most important single asset of most businesses is their stock of customers. Protection of this asset against appropriation by an employee is recognized as a legitimate interest of the employer. A restrictive covenant, therefore, fulfills the first requirement on which its enforceability depends, if it is necessary to protect the employer against loss of his customers.

*Borden*, 547 S.W.2d at 761 (quoting 41 A.L.R. 2d 15, 71 (1955)). An employer's need to protect itself against the loss of its customers can be particularly meaningful with respect to an employee, such as an outside salesman, who "deals with customers away from the employer's place of business and builds up personal relationships that bind the customers to himself instead of to the employer's business." *Id.* at 761-62; *see also Girard v. Rebsamen Ins. Co.*, 685 S.W.2d 526, 527-28 (Ark. Ct. App. 1985).

-11-

A district court in Arkansas has reasoned that an employer has a valid interest in protecting against the loss of its customers with respect to employees who "were the face of the company in their sales territories and spent several years cultivating relationships with their customers." *Church Mut. Ins. Co. v. Copenhaver*, No. 4:09CV00487JMM, 2010 WL 2105623, at *3 (W.D. Ark. May 24, 2010).

We conclude that a genuine issue of material fact exists concerning whether the non-compete agreements were necessary to protect Irby from losing its customers. *See Mercy Health Sys. of Nw. Ark., Inc. v. Bicak*, 383 S.W.3d 869, 873-75 (Ark. Ct. App. 2011); *Statco Wireless, LLC v. Sw. Bell Wireless, LLC*, 95 S.W.3d 13, 16 (Ark. Ct. App. 2003). Before becoming Wholesale employees, Tipton, Gilbert, and Padgett spent several years developing customer relationships as Treadway and Irby employees. According to Tipton, cultivating these customer relationships is important to Irby's business. He further agreed that "it take[s] a while to develop a customer so that they buy from you." As Irby's branch manager, Tipton spoke with customers on a daily basis. Tipton acknowledged that some customers did business with Irby because they knew him, liked him, and had worked with him before. Tipton fostered customer relationships by taking customers on fishing trips to locations as far away as Colorado. Tipton also took customers out for meals. When he left Irby, Tipton called some of his Irby customers "[j]ust to let them know where I was." As inside salesmen, Gilbert's and Padgett's jobs likewise entailed building and maintaining customer relationships. Gilbert attested that, during his time with Irby, he came to know customers on a personal basis. As an example, Gilbert discussed his relationship with one customer, listing some of the companies for which the customer had worked and describing the nature of the customer's business. Padgett also testified that some of his Irby customers called him after he went to Wholesale and placed orders with him. Viewing this evidence in the light most favorable to Irby, we find that a reasonable jury could conclude that the non-compete agreements were necessary to protect Irby against a loss of customers. *See Anderson*, 477 U.S. at 248.

The district court also concluded that the non-compete agreements lacked a reasonable geographic limitation. In particular, the court emphasized that the agreements limited an employee's activities "within [his] territory, *as defined by* [*Irby*]." The court was concerned that Irby could unilaterally define an employee's territory so as to create an unreasonable geographic limitation. We doubt that the non-compete agreements permit the boundless reading that the district court envisioned. As we understand the plain language quoted above, the agreements merely limit an employee's activities within the territory to which Irby had assigned him during his employment.

With the non-compete provisions properly construed, it becomes apparent that there is a genuine dispute of material fact about whether the non-compete agreements have a reasonable geographic limitation. *See Advanced Envtl. Recycling Techs., Inc. v. Advanced Control Solutions, Inc.*, 275 S.W.3d 162, 172 (Ark. 2008); *Bendinger*, 994 S.W.2d at 472-73. A limitation on an employee's activities in the trade area where his former employer operates can be reasonable. *See All-State Supply, Inc. v. Fisher*, 483 S.W.2d 210, 211-12 (Ark. 1972); *Jaraki v. Cardiology Assocs. of N.E. Ark., P.A.*, 55 S.W.3d 799, 804 (Ark. Ct. App. 2001) ("Where a geographic restriction is greater than the [employer's] trade area, the restriction is too broad and the covenant not to compete is void."). However, the parties have not directed us to any record evidence about the size of Irby's trade area or the size of the territory to which Tipton, Gilbert, and Padgett were assigned. In any event, we note that a reasonable factfinder could rely on the relatively limited intrusion that the non-compete agreements imposed on a former employee's livelihood to find that the non-compete agreements' geographic limitation is reasonable. *See Freeman v. Brown Hiller, Inc.*, 281 S.W.3d 749, 752, 756 (Ark. Ct. App. 2008) (upholding non-compete agreement that lacked a geographic limitation but only limited the employee from soliciting business from his former employer's customers); *Girard*, 685 S.W.2d at 528-29 (upholding agreement that lacked a geographic limitation but only limited the employee from soliciting or accepting business from customers whose accounts he

serviced at the time of his termination). For these reasons, we conclude that a genuine issue of material fact exists about whether the non-compete agreements have a reasonable geographic limitation.

### 3. Civil Conspiracy

Irby next argues that the district court erred in granting summary judgment on its claim that Blumfelder and Wholesale conspired with Tipton to violate his fiduciary duty to Irby. Under Arkansas law, Irby "must show a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another." *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 876 (Ark. 2001). The district court granted summary judgment on Irby's civil-conspiracy claim because the court viewed it as derivative of Irby's unsuccessful claim for breach of fiduciary duty. The defendants reiterate this rationale on appeal, asserting that "quibbles over details about phone calls, text messages, or dinner meetings" are insufficient to reverse the court's grant of summary judgment. However, as discussed in Part II.A.1, Tipton's act of coordinating with Blumfelder what appears to be a recruiting meeting for Irby employees as well as Tipton's other communications with Blumfelder, Gilbert, and Padgett are sufficient to generate a genuine dispute of material fact about whether Tipton breached his fiduciary duty. Consequently, the district court's rationale for dismissing Irby's civil-conspiracy claim no longer holds, and the grant of summary judgment on this basis was inappropriate.

### 4. Tortious Interference with a Contract

Irby also argues that granting summary judgment on its claim against Wholesale and Blumfelder for tortious interference with a contract was inappropriate. To succeed on this claim, Irby must show:

-14-

> (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 280 S.W.3d 1, 11 (Ark. 2008). Reasoning that this claim depends on a successful claim for breach of the non-compete agreements, the district court granted summary judgment to Blumfelder and Wholesale. However, as discussed in Part II.A.2, genuine disputes of material fact remain on Irby's claim for breach of contract, thereby undermining the district court's reason for dismissing this claim.

As an alternative basis for affirming the district court's grant of summary judgment, Blumfelder and Wholesale invoke Arkansas law's recognition of a competitor's privilege to compete. *See Office Machines, Inc. v. Mitchell*, 234 S.W.3d 906, 908 (Ark. Ct. App. 2006) ("[T]he defendant will not be liable [for tortious interference with a contract] if he shows that his interference was privileged."). In the context of a claim for tortious interference with a contract, Arkansas courts have held that hiring a competitor's employee is part of this privilege so long as hiring him was not a breach of a non-compete agreement. *W. Memphis Adolescent Residential, LLC v. Compton*, 374 S.W.3d 922, 928 (Ark. Ct. App. 2010); *Office Machines*, 234 S.W.3d at 909. If Blumfelder and Wholesale merely recruited and hired Tipton, Gilbert, and Padgett, then such conduct would constitute privileged competition because, as discussed above, the non-compete agreements allowed Tipton, Gilbert, and Padgett to work anywhere so long as they did not compete with Irby. *See id.* However, recruiting and hiring Tipton, Gilbert, and Padgett so that they would solicit or accept business from Irby customers in their former territory within one year in violation of their non-compete agreements falls outside of the privilege to compete. *See id.*

The evidence in the record is sufficient to create a genuine dispute of material fact on this issue. Blumfelder and Wholesale hired Tipton, Gilbert, and Padgett to work for Wholesale in the same town where they worked for Irby. Moreover, there is no dispute that Irby and Wholesale were competitors. Tipton admitted that, within one year of becoming a Wholesale employee, he called some of his Irby customers "[j]ust to let them know where I was." Gilbert and Padgett similarly testified that, within one year of becoming Wholesale employees, they did business with their former Irby customers. This evidence, viewed most favorably to Irby, creates a genuine dispute of material fact about whether Blumfelder and Wholesale recruited and hired Tipton, Gilbert, and Padgett so that they would solicit or accept business from Irby customers in their former territory within one year in violation of their non-compete agreements.

## B.

The district court awarded the defendants more than $200,000 in attorneys' fees and costs under Ark. Code Ann. § 16-22-308. This provision states that "[i]n any civil action to recover . . . for . . . breach of contract . . . the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs." *Id.* Because of our disposition of this appeal, the defendants are no longer prevailing parties under the statute. *See Bendinger*, 994 S.W.2d at 475; *Armstrong Remodeling & Constr., LLC v. Cardenas*, 417 S.W.3d 748, 757 (Ark. Ct. App. 2012). We therefore vacate the district court's award of attorneys' fees and costs.

## III. Conclusion

For the reasons described above, we reverse the district court's grant of summary judgment on Irby's claims for breach of fiduciary duty, breach of contract, civil conspiracy, and intentional interference with a contract; vacate the district

court's award of attorneys' fees and costs; and remand for further proceedings consistent with this opinion.

_____