United States Court of Appeals

For the Eighth Circuit

_____

No. 15-2294

_____

Symphony Diagnostic Services No. 1 Inc., doing business as MobilexUSA, a
California corporation

*Plaintiff - Appellant*

v.

Kimberly Greenbaum; Josephine Tabanag

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: January 13, 2016
Filed: July 6, 2016

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

After Ozark Mobile Imaging was sold to Mobilex by means of an asset
purchase, two former Ozark employees, Kimberly Greenbaum and Josephine
Tabanag, went to work for Mobilex's competitor, BioTech X-Ray. Mobilex sued
Greenbaum and Tabanag to enforce the non-compete and confidentiality agreements
they had signed with Ozark. The district court granted summary judgment in favor

of Greenbaum and Tabanag on the basis that a personal services contract cannot be assigned to a subsequent employer under Missouri law without the employee's contemporaneous consent. Because we find that the non-compete and confidentiality agreements at issue here were not personal services contracts and could be assigned without the consent of Greenbaum and Tabanag, we reverse and remand.

I

Both Greenbaum and Tabanag worked as mobile x-ray technicians for Ozark prior to its acquisition by Mobilex: Greenbaum from March 2007 onwards, and Tabanag beginning in October 2010. Greenbaum started as a part-time employee, but was eventually given a full-time position and promoted to district manager. Tabanag too described her position at Ozark as full-time, working 40-plus hours a week with full benefits. Neither, according to Mobilex, had a written employment contract.[1] At the time they left Ozark, Greenbaum made $21.50 an hour and Tabanag made $17.50 an hour.

In September 2007, Greenbaum signed a non-compete agreement and a confidentiality agreement with Ozark. Tabanag signed essentially identical agreements in October 2010. Both non-competes began by stating that the employee was entering into the agreement "[i]n consideration of his/her employment by Mobile Medical Services Inc., Ozark Mobile Imaging, Clearview Mobile Imaging, LLC and/or its affiliates . . . ." They went on to state that during his or her term of

---

[1]Greenbaum submitted an affidavit claiming to have signed a written employment contract when she began working at Ozark and each time she was promoted, but no such contracts appear in the record, and Mobilex disputes their existence.

employment and for two years afterwards, the employee agreed within a specified geographical area[2] not to:

1. Directly or indirectly engage in the mobile diagnostic business.
2. In any manner be connected with or employed by a person, company, firm, or corporation engaged in the mobile diagnostic business.
3. For himself/herself or on behalf of any other person, partnership, or corporation call on any customer or customers of Mobile Medical Services, Ozark Mobile Imaging, Clearview Mobile Imaging, LLC, and/or its affiliates, for the purpose of soliciting their business for others.

The separate confidentiality agreements Greenbaum and Tabanag signed consisted of an acknowledgment that they had been instructed on their employer's confidentiality policy, and that they understood that failure to maintain confidentiality was just cause for dismissal.

Mobilex acquired Ozark through an Asset Purchase Agreement in December 2012. Around this same time, it made Greenbaum an offer of employment. Unlike her previous position, the job Mobilex offered Greenbaum was part time, with a 90-day probationary period, no guaranteed number of hours, and no guaranteed benefits. According to an affidavit Mobilex submitted, Greenbaum was offered a part-time position because she had asked to work fewer hours while at Ozark. Greenbaum refused Mobilex's offer.

---

[2]Specifically, within a 100-mile radius of St. Joseph, Missouri; Kansas City, Missouri; Columbia, Missouri; Joplin, Missouri; Laurie, Missouri; Springfield, Missouri; Lincoln, Nebraska; and Omaha, Nebraska.

Tabanag was likewise made an offer by Mobilex. Although Mobilex offered her the same wage she had been earning at Ozark, the position she was offered was part time and without guaranteed benefits. Tabanag also refused Mobilex's offer.

Greenbaum took on a new position as a mobile x-ray technician at Mobilex's competitor, Biotech X-ray, in January 2013, and Tabanag followed suit in February. In September 2013, Mobilex filed a complaint in federal court against Greenbaum and Tabanag, alleging state law claims for breach of contract, breach of fiduciary duty, and tortious interference with a business relationship. After Greenbaum and Tabanag moved for summary judgment, the district court concluded that the success of each of the claims depended on whether the non-compete and confidentiality agreements were assignable from Ozark to Mobilex without Greenbaum's and Tabanag's contemporaneous consent. The district court found that Greenbaum's and Tabanag's consent was necessary in order for the agreements to be assignable. Since it was undisputed that neither had provided consent, the district court entered judgment in their favor on all counts.

II

The central question presented by this case is whether non-compete and confidentiality agreements signed by an employee can be assigned without the employee's consent. Because this case was brought under Missouri state law, we are bound by any relevant decisions of the Missouri Supreme Court. See Leonard v. Dorsey & Whitney, LLP, 553 F.3d 609, 612 (8th Cir. 2009). If no such decisions exist, "we may rely on the decisions of intermediate state courts, unless we are convinced by persuasive data that the highest state court would decide the issue differently." Id. "Persuasive data" in this context includes "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data." Id. (quoting McKenna v. Ortho Pharm Corp., 622 F.2d 657, 663 (3d Cir. 1980)).

-4-

No decision from the Missouri Supreme Court or Missouri's intermediate courts appears to have squarely addressed the question here. Faced with a similar lack of precedent last year in deciding whether Arkansas law permitted "the assignment of an employee's non-compete agreement to a successor employer," we predicted that the Arkansas Supreme Court would adopt what we called the majority rule: that covenants not to compete *can* be assigned to a successor employer. Stuart C. Irby Co. v. Tipton, 796 F.3d 918, 923–24 (8th Cir. 2015) (citing 6 Williston on Contracts § 13:13 (4th ed. 1990)). But see Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC, No. 3718-VCP, 2010 WL 338219, at *11 n.142 (Del. Ch. Jan. 29, 2010) (noting disagreement as to which view commands majority support). Stuart C. Irby supplies the default forecast of what a state's highest court would do when state law is silent, and therefore controls this case. Indeed, the Stuart C. Irby court reached the conclusion it did despite the Arkansas courts' general skepticism of covenants not to compete, see 796 F.3d at 924, a skepticism that the Missouri courts do not appear to share. See Whelan Sec. Co. v. Kennebrew, 379 S.W.3d 835, 841–42 (Mo. 2012) (en banc) (holding that "[t]he law of non-compete agreements in Missouri seeks to balance the competing concerns between an employer and employee in the workforce" and "[i]n balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable"). We predict the Missouri Supreme Court would permit assignment of covenants not to compete without contemporaneous consent. Accord Restatement (Second) of Contracts § 317 cmt. c, illus. 6 (Am. Law Inst. 1981).

The district court thought that a contrary result was required by Roeder v. Ferrell-Duncan Clinic, Inc., 155 S.W.3d 76 (Mo. Ct. App. 2004). In that case, the Missouri Court of Appeals observed that "[i]t is well recognized that in a contract for personal services, which involves special knowledge, skill or a relation of personal confidence, the duty to perform is not assignable without the consent of both parties." Id. at 84 (quoting Kenneth D. Corwin, Ltd. v. Mo. Med. Serv., 684 S.W.2d 598, 600 (Mo. Ct. App. 1985)). But this case, unlike Roeder, does not involve a personal

services contract: it involves free-standing non-compete and confidentiality agreements. Neither agreement formed part of a larger employment agreement that required Greenbaum and Tabanag to provide personal services of any kind to Ozark. By contrast, the plaintiff in Roeder, a physician, had agreed in an employment contract "to provide professional medical services for [his employer's] sole and exclusive benefit during the term of the agreement." Id. at 84. It was this employment contract that Roeder found to be a non-assignable personal services contract. Id.

Greenbaum and Tabanag argue that the non-compete and confidentiality agreements they signed were personal services contracts because the non-compete agreements stated that they were entered into in consideration for continued (albeit at-will) employment by Ozark. Stated differently, in exchange for their signing the non-compete agreements, Ozark agreed not to immediately discharge Greenbaum and Tabanag. But this argument misapprehends the crucial difference between a personal services contract and a non-compete agreement: the former requires affirmative actions by the employee, whereas the latter requires only that they *refrain* from certain actions. Managed Health Care Assocs. v. Kethan, 209 F.3d 923, 929–30 (6th Cir. 2000); see also Sanfillippo v. Oehler, 869 S.W.2d 159, 163 (Mo. Ct. App. 1993) (holding that the non-compete portion of an employment agreement was severable and not a personal services contract); Cropper v. Davis, 243 F. 310, 316 (8th Cir. 1917) (suggesting that contract requiring employee to perform, unlike non-compete, presents involuntary servitude issues); In re Andrews, 80 F.3d 906, 912 (4th Cir. 1996) ("Although the Thirteenth Amendment prohibits a court from specifically enforcing a personal service contract, an agreement not to compete is specifically enforceable if it is reasonable."). As these cases suggest, a contract that imposes on a party affirmative obligations to act raises concerns that are not implicated by a contract that simply forbids certain actions, and its assignment must therefore be policed more carefully. But the fact that Greenbaum and Tabanag signed the non-compete and confidentiality agreements in consideration for continued employment

-6-

did not transform those agreements into personal services contracts, because the agreements imposed no obligation on them to take any affirmative action.

Refusing to enforce the non-compete and confidentiality agreements here just because they were transferred from Ozark to Mobilex without Greenbaum's and Tabanag's consent would lead to anomalous results. If Mobilex had acquired Ozark by way of purchasing its stock rather than its assets, there would be no bar under Missouri law to its enforcing the non-compete and confidentiality agreements. See Alexander & Alexander, Inc. v. Koelz, 722 S.W.2d 311, 312 (Mo. Ct. App. 1986). The court in Alexander held that after an employer merges with its parent, the merged entity is entitled to enforce employment contracts that were entered into pre-merger. Id. at 313. And it suggested that the same rule should apply not just to mergers, but also "the initial acquisition of one company by another by the purchase of stock." Id. We see no reason why the non-compete and confidentiality agreements here should be unenforceable simply because Mobilex's acquisition of Ozark was effected through an asset purchase rather than a transfer of stock. See Managed Health Care, 209 F.3d at 929; 9 John E. Murray, Jr., Corbin on Contracts § 49.5, at 204–05 (rev. ed. 2007) ("The underlying issue of whether an employee should be subject to a non-competition covenant should not depend on matters of form.").

It may make sense to preclude assignment of a non-compete agreement without consent, at least in the absence of an explicit provision permitting assignment, when the assignment would materially change the obligations of the employee, or the employee only agreed to the non-compete because of qualities specific to the employer. See Roeder, 155 S.W.3d at 89; Munchak Corp. v. Cunningham, 457 F.2d 721, 725–26 (4th Cir. 1972). For example, if a non-compete agreement forbade "engaging in the same business ventures as the employer," and the employer was acquired by a company that engaged in a broader set of ventures, the obligations imposed on the employee by the agreement would be expanded by the acquisition. Similarly, if someone agreed to work as a personal assistant to Meryl Streep subject

to a non-compete because of his admiration for Streep's character and work, allowing the non-compete to be assigned to a less accomplished actor without his consent could fairly be viewed as changing the terms of the deal. See Traffic Control Servs., Inc. v. United Rental Northwest, Inc., 87 P.3d 1054, 174–75 (Nev. 2004); Smith, Bell & Hauck, Inc. v. Cullins, 183 A.2d 528, 532 (Vt. 1962); American Colortype Co. v. Continental Colortype Co., 188 U.S. 104, 107 (1903) (Holmes, J.) ("Service is like marriage, which, in the old law, was a species of it. It may be repeated, but substitution is unknown.").

We need not decide whether Missouri would disallow assignments in cases such as these. The non-compete agreements here precluded only working in the field of medical diagnostics or soliciting business from certain clients within a specified geographical area. That obligation is no different whether enforced by Ozark or by Mobilex. See Munchak, 457 F.2d at 725–26; Artromick Int'l, Inc. v. Koch, 759 N.E.2d 385, 389 (Ohio Ct. App. 2001) (upholding assignment because "no additional burdens were placed upon appellee as a result of the asset sale or the assignment of the noncompetition agreement"). And a reasonable jury, looking at the facts in the record, could find that Greenbaum and Tabanag did not agree to the non-compete and confidentiality agreements because of Ozark's unique characteristics. See Alexander, 722 S.W.2d at 313 ("[W]hen a person contracts with a corporation, it must be assumed that person contemplated the almost certain likelihood of change in the corporation and its personnel."); AutoMed Techs., Inc. v. Eller, 160 F. Supp. 2d 915, 924 (N.D. Ill. 2001).

The danger in enforcing a non-compete agreement is that by eliminating other realistic opportunities for employment, it may effectively force the employee to continue working for the employer on the employer's terms. See Osage Glass, Inc. v. Donovan, 693 S.W.2d 71, 73–74 (Mo. 1985) (en banc). Greenbaum and Tabanag say the post-acquisition employment offers Mobilex made them were significantly less attractive than the positions they had enjoyed with Ozark: they were not

guaranteed a minimum number of hours or benefits, for example. But in general, this concern would not be addressed by imposing a rule against assigning non-compete agreements without consent. As far as the record shows, Ozark would have been within its rights at any time to reduce Greenbaum's and Tabanag's hours and deny them benefits, leaving them in the same unenviable position they were put in after the acquisition. To the extent that Greenbaum and Tabanag believe that the specific terms of the non-compete agreements here restrict too heavily their ability to gain future employment, they remain free on remand to challenge the agreements on that basis. See Whelan, 379 S.W.3d at 841–42.

III

We reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

_____